# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TYGON PEAK CAPITAL MANAGEMENT, LLC (f.k.a. TIGER PEAK CAPITAL HOLDINGS, LLC), | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0847-MTZ |
| MOBILE INVESTMENTS INVESTCO, LLC; MOBILE INVESTORS, LLC; VOICE COMM, LLC; ROCK WAVE CAPITAL LLC; ROCKWAVE VC INVESTOR, LLC; DANIEL GOLDBERG, in his individual capacity and in his capacities as President of Rock Wave Capital LLC, as representative of Rockwave VC Investor, LLC, and as a Board Manager of Mobile Investments Investco, LLC; SEVEN SHORES VOICECOMM, LLC; ANDREW CAPLAN, in his capacity as Manager of Seven Shores Voicecomm, LLC and a Board Manager of Mobile Investors, LLC and Mobile Investments Investco, LLC; OLD MILL PARTNERS 2626, LLC, and CARL THORSBERG, in his capacity as representative of Old Mill Partners 2626, LLC and as a Board Manager of Mobile Investments Investco, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# **MEMORANDUM OPINION**
Date Submitted: September 22, 2021
Date Decided: January 4, 2022

Marc S. Casarino, Karine Sarkisian, and Kelly Rowe, WHITE AND WILLIAMS LLP, Wilmington, Delaware; Jarrod D. Shaw and Keisha O. Coleman, MCGUIRE WOODS LLP, Pittsburgh, Pennsylvania, *Attorneys for Plaintiff*.

Kevin M. Gallagher, Angela Lam, and Christian C.F. Roberts, RICHARDS, LAYTON, & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants Mobile Investments Investco, LLC, Mobile Investors, LLC, Voice Comm, LLC, Rock Wave Capital LLC, Rockwave VC Investor, LLC, Daniel Goldberg, Seven Shores Voicecomm, LLC, Andrew Caplan, and Carl Thorsberg*.

This action stems from a years-long dispute between a venture capital firm and its coinvestors in a supply chain management company. Before they acquired the company, the investors first entered into a term sheet, which provided for reimbursement of certain transaction expenses, and then an LLC agreement governing the newly formed investment vehicle that holds the company. The final structure gave the venture capital firm several perks: a management services contract with an accompanying annual management fee, sole ownership of a non-voting unit class, and veto power over certain transactions via a supermajority approval provision in the LLC agreement. But the venture capital firm does not control the investment vehicle.

The investors' relationship soured, testing the strength and scope of these contractual protections. The venture capital firm has not been reimbursed for its transaction expenses, and has stopped receiving the management fee. The dispute came to a head when the other investors proposed a 2019 equity offering, which the venture capital firm alleges was a sham designed to dilute its interest in the investment vehicle and was improperly offered without the firm's contractually required approval. In October 2019, the firm came to this Court seeking to enjoin the offering.

In the twenty-six months since, this case and the world around it have changed. On the eve of the Court's scheduled TRO hearing, the investors withdrew

1

the proposed equity offering. The venture capital firm filed an amended complaint, which the investors moved to dismiss. The Court heard oral argument on that motion nearly a year later, in August 2020.

A month after that, while the motion was under advisement, the investors announced a strategic transaction and a new equity offering to finance it. In response, the venture capital firm filed a second amended complaint. The firm still seeks its closing costs and management fees, pursuant to the term sheet, management services contract, and alternative quasi-contract theories. It also presents defamation and deceptive trade practices claims. Finally, the amended complaint asserts the two equity offerings violated several provisions in the LLC agreement.

The defendants moved to dismiss the second amended complaint. I conclude that while it fails to state tort and quasi-contract claims, certain breach of contract claims remain viable. For the reasons that follow, the motion to dismiss is granted in part and denied in part.

## I. BACKGROUND[1]

Plaintiff Tygon Peak Capital Management, LLC ("Tygon Peak")[2] is a private equity firm. Tygon Peak's Verified Second Amended Complaint (the "Second Amended Complaint") stems from its 2018 acquisition (the "Acquisition") of defendant Voice Comm, LLC ("Voice Comm") and ensuing disputes among Tygon Peak and its coinvestors.

### A. Tygon Peak Solicits Financing To Acquire Voice Comm.

Tygon Peak began the process of acquiring the business that would become Voice Comm in early 2018. Voice Comm offers supply chain management services for mobile device accessories. Before the Acquisition, Voice Comm's predecessor was owned by nonparty Derek Weiss and his affiliates.[3]

---

[1] On this motion to dismiss, I draw the following facts from plaintiff's Verified Second Amended Complaint, available at Docket Item ("D.I.") 79 [hereinafter "SAC"], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

[2] During many of the relevant events of this case, Tygon Peak was known as Tiger Peak Capital Holdings, LLC. To avoid confusion, I use "Tygon Peak" throughout, as the parties have.

[3] Voice Comm's predecessor was called "Voice Comm L.L.C." *See* SAC ¶¶ 33–36. The entity involved in this case was not formed until August 2018, under the name "Voice Comm Operations." *See* SAC ¶ 33. That entity eventually changed its name to "Voice Comm LLC" after the Acquisition. The distinction between Voice Comm and its predecessor is immaterial here, so I use the defined term "Voice Comm" to refer to the defendant.

3

In February 2018, Tygon Peak secured a letter of intent to acquire Voice Comm's predecessor and began recruiting other investors. Tygon Peak first obtained support from Rock Wave Capital LLC ("Rock Wave Capital"), affiliated with defendant Daniel Goldberg. On June 11, Tygon Peak and Rock Wave Capital entered into a term sheet (the "Term Sheet").[4] By its plain language, the Term Sheet was mostly nonbinding, but the "Confidentiality," "Expenses," and "Exclusivity" provisions were binding.[5] The "Expenses" provision provided that Voice Comm would reimburse Tygon Peak for all expenses incurred in connection with the Acquisition.[6] The Term Sheet also contemplated that Tygon Peak would be entitled

---

[4] SAC Ex. A [hereinafter, "Term Sheet"].

[5] *Id.* at 6 ("Non-Binding Terms. Except for the 'Confidentiality' and 'Expenses' and 'Exclusivity' sections of this Term Sheet set forth above, which are intended to be legally binding on [Rock Wave Capital] and [Tygon] Peak, this Term Sheet is non-binding in all other respects and shall not constitute an agreement by [Rock Wave Capital] or [Tygon] Peak to be bound by any other terms or conditions in connection with a proposed investment transaction, and no offer or binding commitment of any nature whatsoever shall be implied regarding an investment transaction, unless and until definitive written documentation providing for a transaction has been executed and delivered by all parties." (formatting altered)).

[6] *Id.* at 5 ("Expenses: At closing, the Target [Voice Comm] will reimburse [Tygon] Peak, Investco and each Member and their respective affiliates for any costs and expenses of such persons or entities and their respective affiliates (including fees and expenses of attorneys, accountants, consultants, and out of pocket expenses of such persons or entities and their respective affiliates) incurred in connection with the transactions contemplated by this Term Sheet. If the Closing does not occur, each Member will be responsible for their own broken deal costs." (formatting altered)).

4

to an ongoing management fee and a "promote," or carried interest, as consideration for the agreement between Tygon Peak and Rock Wave Capital.[7]

Tygon Peak also recruited as investors defendants Seven Shores Voicecomm, LLC ("Seven Shores"), affiliated with defendant Andrew Caplan; and Old Mill Partners 2626, LLC ("Old Mill"), affiliated with defendant Carl Thorsberg. Seven Shores and Old Mill became members in Voice Comm, while Rock Wave Capital invested through an affiliate, Rockwave VC Investor, LLC ("Rockwave VC").

The investors engaged Rush Street Capital, LLC ("Rush Street") to help source and arrange financing for the Acquisition. Tygon Peak entered into an agreement with Rush Street and paid Rush Street nearly $300,000; it also incurred additional costs and expenses in connection with that agreement. To date, Voice Comm has refused to reimburse Tygon Peak for these costs.

The parties created several entities to manage Voice Comm. On July 16, they formed an investment vehicle, defendant Mobile Investments Investco, LLC ("Investco"). As of the Acquisition, Investco owned an 80% interest in an intermediary investment vehicle, defendant Mobile Investors, LLC ("Mobile"). Weiss's entity, nonparty KMD Weiss Investments, LLC ("KMD Weiss") owned the

---

[7] *See id.* at 2 (describing Tygon Peak's "Class A Units" and "Monitoring/Management Fee"); *see also id.* at 5 (referencing Tygon Peak's "promote").

other 20% share in Mobile.  On August 3, the parties formed Voice Comm as a wholly owned subsidiary of Mobile.

The Acquisition closed on August 31.  Tygon Peak and the other investors secured interests in Voice Comm through Investco Class B shares:  Tygon Peak owned 6.8% of the Class B Units, Rockwave VC owned 61.8%, Seven Shores owned 26.7%, and Old Mill owned 2.7%.  Tygon Peak's promote manifested as 100% of Investco's nonvoting Class A units.[8]  The initial ownership structure is reflected in the diagram below:



Rock Wave Capital is affiliated with Rockwave VC, but is not depicted on this diagram because it is not alleged to own any stake in any depicted entity.  I refer to Rockwave VC, Rock Wave Capital, Seven Shores, Old Mill, Investco, and Mobile as the "Entity Defendants."

---

[8] *See* SAC Ex. B § 2.1(c) [hereinafter "Investco LLC Agr."]; *see also* Term Sheet 1.

The investors' human principals manage Investco and Mobile. Each has a four-member board of managers (the "Investco Board" and the "Mobile Board," respectively), which originally comprised Goldberg, Caplan, and Thorsberg (together, the "Individual Defendants," and with the Entity Defendants, "Defendants"),[9] and Tygon Peak's principal, nonparty Haran Narulla.

### B. After The Acquisition, The Parties Enter Several Post-Closing Agreements.

After the Acquisition closed, the parties entered into three relevant agreements. The first was an LLC agreement for Investco (the "Investco LLC Agreement").[10] The Investco LLC Agreement includes several terms designed to protect Tygon Peak's interests. These include a supermajority approval provision, whereby Narulla could veto certain transactions between Investco and its members;[11] and provisions requiring that all members receive twenty-four hours'

---

[9] At the most recent hearing in this matter, I dismissed Caplan and Thorsberg because Tygon Peak did not make any claim against them. *See* D.I. 102 at 9 [hereinafter "Hr'g Tr."].

[10] Investco LLC Agr.

[11] *See id.* § 5.10; *see also id.*, App. A at B-6 (defining "Supermajority of the Board" to include the "Class A Manager," defined in Section 5.1(c) to be Tygon Peak's representative, Narulla).

7

notice of action by written consent.[12]  The Investco LLC Agreement also contains an integration clause.[13]

Second, Mobile issued a $13 million promissory note in favor of Voice Comm (the "Promissory Note").  Voice Comm, Investco, and KMD Weiss executed a related "Sharing Agreement" the day the Acquisition closed.[14]  The Sharing Agreement gave Investco and KMD Weiss an option to assume a prescribed share of the Promissory Note if Mobile became insolvent (the "Option") upon an

---

[12] *Id.* § 6.3 ("Written Consent to Action.  Any action required or permitted to be taken by the Members (or by any Members), whether at a meeting or otherwise, may be taken without a meeting; provided, that twenty-four (24) hours' advance e-mailed notice of the action to be taken is first given to all Members, and the action is evidenced by a written consent or other written instrument dated and signed (whether or not in counterparts and whether or not through facsimile or e-mail copies) by that Member or those Members (or its or their designated representative) necessary to authorize or take the action that is the subject of such written consent." (formatting altered)); *see also id.* § 5.8 ("Action Without a Meeting.  Any action required or permitted to be taken by the Board, whether at a regular or special meeting thereof or otherwise, may be taken without a meeting; provided, that twenty-four (24) hours' advance e-mailed notice of the action to be taken is first given to all Managers, and the action is approved in writing by a written consent or other written instrument signed by a majority of the Managers (whether or not in counterparts and whether or not through facsimile or email copies)." (formatting altered)).

[13] *Id.* § 12.4(a) ("Entire Agreement.  This Agreement, together with its schedules and appendices, and together with the Certificate, constitutes the entire agreement between the Members with respect to its subject matter, and supersedes any and all other prior agreements and undertakings with respect to such subject matter among them.  No Member is making any guarantee, promise, or undertaking any obligation to or with respect to the LLC that is not expressly contained in this Agreement.").

[14] SAC Ex. H [hereinafter "Sharing Agr."].

8

affirmative vote by Investco and KMD Weiss.[15]  Narulla signed the Sharing

Agreement on Investco's behalf.[16]

Finally, Tygon Peak and Mobile entered into a Management Services

Agreement ("MSA"), as contemplated by the Term Sheet.[17]  The MSA provided that

Mobile would pay Tygon Peak a $300,000 annual management fee (the "Annual

Management Fee") in exchange for its services advising Mobile, its board, and its

subsidiaries.[18]  The Annual Management Fee was to be paid in quarterly

installments.[19]

### C.    The Parties' Business Relationship Deteriorates.

Within a year of the Acquisition's closing, the parties' relationship began to

sour.  In June 2019, disputes over the MSA arose and Goldberg indicated that Rock

---

[15] *See id.* § 2.1(a) ("<u>Grant</u>.  The Noteholder [Voice Comm] hereby grants to the Class A Members [Investco and KMD Weiss] an exclusive, irrevocable right and option, exercisable by the Class A Members at any time upon the occurrence and continuation of an Insolvency Event, in the Class A Members' sole discretion, to acquire, subject to the terms and upon the conditions set forth in this Section 2, the Class A Pro Rata Portion of the Noteholder's right, title and interest in and to the [Promissory Note]."); *id.* § 2.1(c) ("<u>Exercise Procedure</u>.  The Option may be exercised by the Class A Members upon an affirmative vote of a majority of the Class A Units, at any time upon the occurrence and continuation of an Insolvency Event upon delivery by [Investco] of a written exercise notice to the Noteholder (an 'Exercise Notice') providing that the Class A Members have elected to exercise the Option.").

[16] *See id.* at 6.

[17] SAC Ex. C [hereinafter "MSA"].

[18] *See id.* §§ 1(A)(i)–(xii), 2(B).

[19] *See id.* § 2(B).

9

Wave Capital would be taking over Tygon Peak's management duties. By July 1, Mobile stopped paying Tygon Peak its Annual Management Fee.

Thereafter, Tygon Peak's coinvestors began efforts to remove Tygon Peak from the Voice Comm investment. On an August 16 call, Goldberg informed Narulla that he was being removed from the Mobile Board. Narulla has since been removed from the Mobile Board and replaced with Weiss; he is still a member of the Investco Board.[20] Goldberg also expressed his desire to have Tygon Peak bought out of the investment. Tygon Peak alleges that Goldberg only offered to purchase Tygon Peak's shares at a steep discount; negotiations were fruitless. On August 23, Defendants threatened "alternative steps" to oust Tygon Peak.[21]

Tygon Peak alleges Defendants followed through on their threat in several ways. In October, the Individual Defendants, as managers of the Investco Board, proposed to issue 800,000 new Class B Units for $1.00 per Unit (the "2019 Offering"). For every 100 new Class B Units issued, Investco would issue one new Class A Unit. Any Class B Member who purchased new Class B Units would receive the corresponding number of Class A Units for free. The Investco Board authorized the 2019 Offering on October 11 by written consent, indicating Investco

---

[20] *See* SAC Ex. I at 6.

[21] SAC ¶¶ 89, 91. The Second Amended Complaint uses the defined term "Defendants," and does not specify whether Goldberg or the other Individual Defendants made these threats.

was raising money to pay down debt.[22]  On October 14, the Investco Board sent notice of the 2019 Offering to its Class B members, including Tygon Peak.[23]

While the written consent indicated Investco was raising money to pay down debt,[24] Tygon Peak alleges two different motives.  First, Tygon Peak alleges the 2019 Offering was a "sham offering" designed to significantly dilute Tygon Peak's Investco interest and promote, as Tygon Peak is the sole holder of Class A Units.[25] Tygon Peak also alleges the money raised was earmarked for a secret "add-on" transaction by Voice Comm.[26]  While Defendants persistently denied such an add-on was in the works, Voice Comm ultimately pursued this transaction in 2020 in what will be described below as the "Tessco Assets" transaction.

Amid the parties' disputes, in October 2019, Goldberg made "disparaging statements" about Tygon Peak and Narulla to two of Voice Comm's lenders, Graycliff Partners and Investors Bank.[27]  During an email exchange among the lenders, Narulla, and Goldberg, Goldberg told the lenders "about Tygon Peak's purported 'dereliction of duties and responsibilities.'"[28]  Tygon Peak alleges these

---

[22] SAC Ex. D 1–2.

[23] *See generally* SAC Ex. E.

[24] SAC Ex. D 1–2.

[25] SAC ¶ 5.

[26] *Id.* ¶ 97.

[27] *Id.* ¶¶ 164–65.

[28] *Id.* ¶ 165.

11

statements were untrue and harmed its reputation, including its ability to do business with Graycliff Partners and Investors Bank in the future.

### D. Tygon Peak Files This Action And Defendants Withdraw The 2019 Offering.

On October 24, 2019, Tygon Peak filed its original complaint, along with a motion for temporary restraining order seeking to enjoin Investco from proceeding with the 2019 Offering.[29] The Court scheduled an expedited hearing on the matter for November 1.[30]

On October 31, one day before the motion was to be heard, Defendants "agreed to postpone" the 2019 Offering.[31] On November 13, the Investco Board formally withdrew the 2019 Offering by written consent.[32] In response, Tygon Peak filed its first amended complaint on November 25.[33] On January 24, 2020, Defendants moved to dismiss the first amended complaint.[34]

---

[29] D.I. 1.

[30] D.I. 3.

[31] D.I. 6; SAC ¶ 120.

[32] SAC Ex. F.

[33] D.I. 24.

[34] D.I. 33.

### E. Voice Comm Faces Financial Trouble And Acquires New Assets.

While the parties briefed that motion, Voice Comm saw its already precarious business deteriorate. In March 2020, Voice Comm defaulted on certain of its loan obligations to Graycliff Partners. Tygon Peak blames Defendants' mismanagement and "bad faith" for these problems.[35] Investco later transferred 3% of its interest in Mobile to Graycliff Partners to settle outstanding obligations (the "Equity Interest Grant").

In the wake of Voice Comm's financial struggles, Investco and KMD Weiss sought to exercise the Option under the Sharing Agreement. On April 6, Goldberg sent Narulla notice that Investco and KMD Weiss intended to exercise the Option.[36] They proceeded to do so despite opposition from some of Voice Comm's creditors and Tygon Peak.

By August 2020, the parties had completed briefing Defendants' first motion to dismiss, presented oral argument, and filed supplemental briefs at my request.[37] That motion was under advisement when Defendants began pursuing the aforementioned "add-on," in which Voice Comm acquired certain assets from Tessco Technologies, Inc. (the "Tessco Assets"). Tygon Peak objects to this

---

[35] SAC ¶ 127.

[36] SAC Ex. G.

[37] D.I. 57; D.I. 59; D.I. 60; D.I. 61; D.I. 64.

13

transaction, as well; that objection inspired another amendment to the complaint, and another motion to dismiss, which is the subject of this decision.

The Tessco Assets transaction involved several discrete steps. First, to finance the transaction, Investco raised capital through a new equity offering (the "2020 Offering").[38] In the 2020 Offering, Investco planned to sell approximately 1,450 new Investco Class B units for $1,000 per share.[39] Investco would use the proceeds to purchase new shares in Mobile, and Mobile would then contribute that cash to Voice Comm. Voice Comm would complete the transaction by using that cash to purchase the Tessco Assets.

Tygon Peak asserts that the Option, Equity Interest Grant, and 2020 Offering all diluted its Class A units in Investco. The Option and the Equity Interest Grant diluted Investco's interest in Mobile from 80% to just over 48%.[40] Tygon Peak specifically alleges the 2020 Offering diluted its Class A interest just as the 2019 Offering would have, even though the 2020 Offering did not entitle the purchasers

---

[38] *See* SAC Ex. J at 1; *see also* SAC Ex. I at 1.

[39] *Compare* SAC ¶ 149 (alleging the 2020 Offering comprised 1,453.41 new units), *with* SAC Ex. J at 1 (indicating the 2020 Offering would comprise 1,459.41 new units).

[40] SAC Ex. J at 1; *see also* SAC Ex. I at 6. While neither the Option nor the Equity Interest Grant changed the capital structure of Investco's Class A membership, Tygon Peak appears to assert that both occurrences diluted its Class A Investco holdings because they diluted Investco's stake in Mobile.

of new Class B units to "a corresponding number of Class A Units for free," as the 2019 Offering did.[41]

On September 25, Thorsberg informed Tygon Peak, through Narulla, that Voice Comm was planning to purchase the Tessco Assets, financed by selling equity in Investco.[42] Throughout October, Narulla requested more information, and Thorsberg resisted. On October 8, the Individual Defendants, as the Investco Board, executed a written consent approving the 2020 Offering.[43] Narulla did not join the Investco Board's written consent.[44] The next day, Thorsberg informed Investco's Class B unitholders of the 2020 Offering and Tessco transaction by letter.[45] Investco consummated the 2020 Offering, selling the new Class B shares to its existing members. Voice Comm completed the transaction when it acquired the Tessco Assets on December 4.

## F. Tygon Peak Files Its Second Amended Complaint.

Tygon Peak responded by adding to its list of grievances in this litigation. On September 30, while the Court was considering Defendants' motion to dismiss the

---

[41] Tygon Peak insists, in a footnote and without explanation, that issuing "approximately 1,450 new Class B Units" diluted Tygon Peak's Class A interest. *See* SAC ¶ 7 n.1; *see id.* ¶¶ 93, 153–54.

[42] *See* SAC Ex. I.

[43] SAC Ex. J at 1.

[44] *Id.* at 3.

[45] Goldberg sent another letter on October 12, with enclosed forms to either waive or exercise the member's preemptive rights. *See* SAC Ex. K.

first amended complaint, Tygon Peak sought to file a "supplemental brief" opposing that motion and incorporating new allegations regarding the 2020 Offering and the upcoming Tessco Assets purchase.[46]  The Court denied that motion and directed Tygon Peak to present its new factual allegations by supplementing its complaint in accordance with Rule 15(d).[47]  Tygon Peak filed a motion for leave to file a second amended complaint on January 21, 2021.[48]  The Court granted that motion on February 11.[49]

Tygon Peak filed the operative Second Amended Complaint on February 19.[50] The Second Amended Complaint contains nine counts.  Count I alleges Rock Wave Capital breached the Term Sheet by failing to reimburse Tygon Peak for closing expenses related to its engagement of Rush Street.  Count II alleges the Entity Defendants were unjustly enriched by the same conduct.  Count III alleges Mobile breached the MSA by failing to pay Tygon Peak the Annual Management Fee. Count IV alleges Investco breached several Investco LLC Agreement provisions through the 2019 Offering, the 2020 Offering, the Option, and other related transactions.  Count V alleges Investco, Rockwave VC, Seven Shores, and Old Mill

---

[46] D.I. 65.

[47] D.I. 67.

[48] D.I. 71.

[49] D.I. 78.

[50] *See generally* SAC.

breached the implied covenant of good faith and fair dealing through the 2019 Offering and the 2020 Offering. Count VI alleges Voice Comm and Investco breached the Investco LLC Agreement and the Sharing Agreement when they exercised the Option. Counts VII alleges Goldberg, Rock Wave Capital, and Rockwave VC violated the Delaware Deceptive Trade Practices Act; Count VIII alleges the same defendants defamed Tygon Peak. Count IX seeks a declaratory judgment.

On March 4, Defendants moved to dismiss the Second Amended Complaint (the "Motion").[51] The parties fully briefed the Motion and the Court heard oral argument on September 22.[52]

## II.    RULE 12(B)(1)

Defendants have moved to dismiss the Complaint under Rule 12(b)(1), on justiciability grounds, and under Rule 12(b)(6), for failure to state a claim. I address subject matter jurisdiction first, as I can only substantively review the pleadings if I have jurisdiction to do so.[53]

Defendants seek to dismiss Counts I, II, and IX, as well as portions of Counts IV and V relating to the 2019 Offering, as nonjusticiable. Defendants variously

---

[51] D.I. 83.

[52] D.I. 101; Hr'g Tr.

[53] *See K & K Screw Prods., LLC v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *6 (Del. Ch. Aug. 9, 2011).

argue these counts are not ripe, moot, or seek advisory opinions. "Because the requirement of an actual controversy goes directly to the court's subject matter jurisdiction over an action, a motion to dismiss based on justiciability grounds is properly viewed in the context of Court of Chancery Rule 12(b)(1)[.]"[54] Tygon Peak bears the burden of pleading sufficient facts to establish the Court's subject matter jurisdiction.[55] When, as here, defendants' jurisdictional challenge is "directed to the face of a complaint,"[56] "the Court should accept the material factual allegations in the complaint as true, and all inferences therefrom should be construed in the non-moving party's favor."[57]

### A. Counts I And II Are Ripe For Judicial Review.

Count I alleges Rock Wave Capital breached the Term Sheet by failing to cause Voice Comm to reimburse Tygon Peak for certain Acquisition closing costs.[58] Count II repackages this allegation as an unjust enrichment claim against all the

---

[54] *Nama Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 435 n.43 (Del. Ch. 2007).

[55] *E.g.*, *Hall v. Coupe*, 2016 WL 3094406, at *2 (Del. Ch. May 25, 2016).

[56] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *3 (Del. Ch. Apr. 30, 2014).

[57] *de Alder v. Upper N.Y. Inv. Co. LLC*, 2013 WL 5874645, at *7 (Del. Ch. Oct. 31, 2013) (footnotes and internal quotation marks omitted) (citing *Diebold*, 267 A.2d at 588, and *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 489 (Del. 1982)); *see also, e.g.*, *Janowski v. Div. of State Police*, 981 A.2d 1166, 1169 (Del. 2009); *Wilm. Fraternal Order of Police Lodge #1 v. Bostrom*, 1999 WL 39546, at *4 (Del. Ch. Jan. 22, 1999); *PPL Corp. v. Riverstone Hldgs. LLC*, 2020 WL 3422397, at *3 (Del. Ch. June 22, 2020)

[58] SAC ¶¶ 169–73.

18

Entity Defendants.[59]  Defendants argue that these claims are not ripe, asserting that the Term Sheet requires that Tygon Peak first demand reimbursement, and that the Second Amended Complaint failed to plead that demand.  I conclude that even if Tygon Peak must plead that it demanded reimbursement, it has sufficiently done so, and so its claims are ripe.

> To evaluate ripeness, the Court makes a "common sense assessment":
>
> A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form.  Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static.  Conversely, a dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention.[60]

The ripeness doctrine conserves scarce judicial resources and "prevents Delaware courts from exercising jurisdiction over disputes where doing so would result in the rendering of an advisory or hypothetical opinion."[61]

---

[59] *Id.* ¶¶ 174–78.

[60] *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1217–18 (Del. 2014) (footnotes and internal quotation marks omitted) (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989), and *Julian v. Julian*, 2009 WL 2937121, at *3 (Del. Ch. Sept. 9, 2009), and *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006), and then quoting *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 631–32 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006)).

[61] *Solak v. Sarowitz*, 153 A.3d 729, 736 (Del. Ch. 2016).

As a threshold matter, the "Expenses" portion of the Term Sheet does not require that Tygon Peak formally demand reimbursement.[62] Defendants admit the Term Sheet "does not contain a formal demand requirement."[63]

Defendants still argue it is "reasonable to infer that this was a condition precedent to Voice[]Comm's obligation."[64] In the absence of a formal contractual demand requirement, Defendants find no support in *Kilcullen v. Spectro Science, Inc.*,[65] where the Court dismissed an indemnification claim as unripe based on plain contractual language requiring such a demand.[66] And because Tygon Peak's many complaints have consistently and repeatedly alleged Defendants "refused" to reimburse Tygon Peak for its Rush Street expenses,[67] Defendants find no support in

---

[62] *See* Term Sheet 5 ("<u>Expenses</u>: At closing, the Target [Voice Comm] will reimburse [Tygon] Peak, Investco and each Member and their respective affiliates for any costs and expenses of such persons or entities and their respective affiliates (including fees and expenses of attorneys, accountants, consultants, and out of pocket expenses of such persons or entities and their respective affiliates) incurred in connection with the transactions contemplated by this Term Sheet. If the Closing does not occur, each Member will be responsible for their own broken deal costs." (formatting altered)).

[63] D.I. 88 at 18.

[64] *See id.*

[65] 2019 WL 3074569 (Del. Ch. July 15, 2019).

[66] *See id.* at *7 (addressing language limiting indemnifiable "Losses" to only those that had been "asserted," while the claimant's pleading was "devoid of any allegations of asserted demands or claims by [the products end users]," and relied instead on the possibility of "future additional Losses").

[67] *E.g.*, SAC ¶¶ 5, 64, 66, 176.

*In the Matter of Estate of Chambers*.[68]  There, the Court addressed a claim that the respondent, as executor of the subject estate, breached his fiduciary duties by failing to repay or reimburse the petitioner for certain funeral expenses.[69]  The Court concluded the petitioner failed to state a claim under Rule 12(b)(6) in part because the petition did not allege that the executor "affirmatively declined to repay or refund" these expenses or that the estate had been administered and the requests wrongfully ignored.[70]  The Court went on to note that these deficiencies rendered the claim "premature and unripe."[71]

Given the plain meaning of "refusal" and Delaware's liberal notice pleading standard, Tygon Peak's allegations that Defendants have "refused" to reimburse Tygon Peak encompass both a request for reimbursement, to the extent one is required, and a denial of that request.[72]  Because "litigation [over Tygon Peak's reimbursement rights] sooner or later appears to be unavoidable" and "the material

---

[68] 2019 WL 4110674 (Del. Ch. Aug. 29, 2019), *adopted*, 2019 WL 4390445 (Del. Ch. Sept. 12, 2019).

[69] *Id.* at *3

[70] *Id.*

[71] *Id.*

[72] *See, e.g.*, *Refusal*, *Black's Law Dictionary* (11th ed. 2019) ("The denial or rejection of something offered or demanded.").

21

facts [supporting those claims] are static,"[73] Counts I and II are ripe for judicial review.

## B.    Count IX Is Not Ripe.

Defendants also contend Count IX's request for a declaratory judgment should be dismissed because it seeks an advisory opinion. That count seeks a declaratory judgment "holding that . . . any agreement or transaction between Investco and any Manager, Member, or Affiliate, including a share offering or issuance, requires Supermajority Approval" under Voice Comm's LLC Agreement.[74]

Under the Delaware Declaratory Judgment Act, "parties to a contract can seek declaratory judgment to determine any question of construction or validity and can seek a declaration of rights, status or other legal relations thereunder."[75] "Delaware courts are statutorily authorized to entertain an action for a declaratory judgment, provided that an actual controversy exists between the parties."[76] To establish an "actual controversy," Tygon Peak must show four factors:

---

[73] *See XL Specialty*, 93 A.3d at 1217.

[74] SAC ¶ 216.

[75] *Vills. of Five Points Ventures, LLC v. Vills. of Five Points Prop. Owners Ass'n, Inc.*, 2020 WL 6689973, at *4 (Del. Ch. Nov. 13, 2020) (quoting *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006)).

[76] *XL Specialty*, 93 A.3d at 1216–17 (footnotes and internal quotation marks omitted) (citing 10 *Del. C.* § 6501, and then quoting *Stroud*, 552 A.2d at 479).

(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[77]

As explained above, a dispute is not ripe "where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention."[78]  While declaratory judgments may be used "to advance the stage at which a matter is traditionally justiciable, the [Declaratory Judgment Act] is not to be used as a means of eliciting advisory opinions."[79]

In support of its position, Tygon Peak points to *KLM Royal Dutch Airlines v. Checchi*,[80] where this Court entertained a declaratory judgment claim evaluating the validity of a shareholder rights plan even though no hostile takeover was pending.[81] The complaint in *KLM* contended the board's adoption of the rights plan, even without triggering it, was a breach of fiduciary duty and "presently interfere[d] with KLM's contractual rights."[82]  The *KLM* Court noted the plaintiff "[did] not seek this

---

[77] *Stroud*, 552 A.2d at 479–80 (Del. 1989) (quoting *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973)).

[78] *XL Specialty*, 93 A.3d at 1217.

[79] *Anonymous v. State*, 2000 WL 739252, at *4 (Del. Ch. June 1, 2000) (internal quotations omitted) (quoting *Stroud*, 552 A.2d at 479).

[80] 698 A.2d 380 (Del. Ch. 1997).

[81] *See id.* at 382–83.

[82] *Id.*

Court's ruling on some future act, but a declaration as to actions already taken by [the company's] board."[83]  Tygon Peak also cites *In re Digex Inc. Shareholders Litigation*,[84] where this Court found a declaratory judgment claim for breach of fiduciary duty was ripe where "the plaintiffs' claim concern[ed] . . . a vote that has already occurred," leaving "the full factual record in its wake."[85]

But unlike the plaintiffs in in *KLM* and *Digex*, Tygon Peak does not challenge "actions already taken"[86] by the Investco Board with a resulting "full factual record."[87]  Rather, Tygon Peak seeks a declaration passing on the validity of "any" hypothetical future offering the Investco Board may propose, and asks the Court to declare that "any" future agreement or transaction involving any of Investco's managers, members, or affiliates would require Tygon Peak's approval.[88]  Tygon Peak's claim that a future offering would violate the Investco LLC Agreement is based on "uncertain and contingent events,"[89] including the timing and terms of a

---

[83] *Id.*

[84] 789 A.2d 1176 (Del. Ch. 2000).

[85] *See id.* at 1206.

[86] *KLM*, 698 A.2d at 383.

[87] *Digex*, 789 A.2d at 1206.

[88] SAC ¶ 216; *see also id.* at 60 ("Declaring that any agreement or transaction between Investco and any Manager, Member, or Affiliate, including the proposed Issuance, requires Supermajority Approval.").  The term "Issuance" is not defined in the Second Amended Complaint, but in the first amended complaint, it referred to the 2019 Offering.  *See* D.I. 24 ¶ 92.

[89] *XL Specialty Ins*, 93 A.3d at 1217.

potential future offering. Tygon Peak does not tie its claim to any particular terms or point to any pending proposed offering. Even if I were to read the Second Amended Complaint as alleging the Investco Board soon will propose another offering, the dispute is not yet ripe because the material facts are not static.[90] Uncertain facts include the type of securities offered, the target buyers of such securities, and, crucially, whether and when the Investco board will seek Tygon Peak's approval. Without more concrete facts, I would be forced to opine on the validity of an entirely hypothetical offering that may or may not resemble the 2019 Offering or the 2020 Offering.

Because Count IX seeks a declaration "based on uncertain and contingent events that may not occur," it is not ripe for judicial review and seeks an advisory opinion.[91] "[A]bsent a pending transaction, there is no need for prompt resolution of this claim, let alone a need that outweighs the expense of limited judicial resources."[92] The Motion is granted with respect to Count IX.

### C. Withdrawing The 2019 Offering Did Not Moot Counts IV and V.

At oral argument on the Motion, I addressed and rejected Defendants' argument that withdrawing the 2019 Offering mooted Count IV's claims stemming

---

[90] *See id.*

[91] *See id.* at 1217–18; *Stroud*, 552 A.2d at 480.

[92] *In re Ebix, Inc. S'Holder Litig.*, 2014 WL 3696655, at *12 (Del. Ch. July 24, 2014).

from the 2019 Offering.[93]  The same reasoning applies to Defendants' argument that withdrawing the 2019 Offering mooted similar claims in Count V.  Those claims are not moot and I consider their substance below.

### D. This Court Lacks Subject Matter Jurisdiction Over Count VIII's Defamation Claim.

Count VIII alleges Goldberg, Rock Wave Capital, and Rockwave VC defamed Tygon Peak by making statements to Graycliff Partners and Investors Bank.[94]  No party raised the issue of whether this Court has subject matter jurisdiction to consider this claim until Defendants mentioned it in their reply brief.[95]  Nevertheless, this Court has a duty to determine whether it has subject matter jurisdiction over a plaintiff's claims and can raise the jurisdictional issue *sua sponte*.[96]

---

[93] *See* Hr'g Tr. 4–6.

[94] SAC ¶ 205.

[95] *See* D.I. 95 at 32.

[96] *See*, *e.g.*, Ct. Ch. R. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action."); *Envo*, 2009 WL 5173807, at *4 n.10 ("The issue of subject matter jurisdiction is so crucial that it may be raised at any time before final judgment and by the court *sua sponte*."); *IBM Corp. v. Comdisco, Inc.*, 602 A.2d 74, 77 n.5 (Del. Ch. 1991) ("[U]nlike many jurisdictions, judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties.").

"The Court of Chancery is proudly a court of limited jurisdiction."[97] An independent claim for defamation does not fall within the purview of this Court's equitable jurisdiction because "*equity will not enjoin a libel*."[98] In view of this Court's limited ability to redress common-law torts, as well as its inability to sanction a party solely for speech, defamation and its subcategories of libel and slander "are seen as denizens of the Superior Court, and are subject to the findings made there by juries regarding the speech of their peers."[99] The boundaries of Chancery's jurisdiction in this area have been carefully drawn, with only one narrow exception surviving the maxim that equity will not enjoin a libel.[100]

Recently, in *Smith v. Scott*,[101] Vice Chancellor Slights reiterated "the Court of Chancery, *in all instances*, lacks subject matter jurisdiction to adjudicate the

---

[97] *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019); *see also Pike Creek Recreational Servs., LLC v. New Castle Cty.*, 238 A.3d 208, 212 (Del. Super. 2020) (noting that "Delaware proudly guards the historic and important distinction between legal and equitable jurisdiction" (internal quotation marks omitted) (quoting *Weston Invs., Inc. v. Domtar Indus., Inc.*, 2002 WL 31011141, at *1 (Del. Super. Sept. 4, 2002))).

[98] *Preston Hollow Cap. LLC v. Nuveen LLC*, 2019 WL 3801471, at *9 (Del. Ch. Aug. 13, 2019) (interpreting *J.C. Pitman & Sons, Inc. v. Pitman*, 47 A.2d 721 (Del. Ch. 1946)); *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 115 (Del. Ch. 2017).

[99] *Preston Hollow*, 2019 WL 3801471, at *1.

[100] *See Pitman*, 47 A.2d at 726. That narrow exception is trade libel. Tygon Peak did not argue that its defamation claim was actually a trade libel claim, so I do not consider the issue here.

[101] 2021 WL 1592463 (Del. Ch. Apr. 23, 2021).

questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice."[102]  *Smith* went on:

> To the extent the parties would have me exercise subject matter jurisdiction over Plaintiffs' defamation claim under the "clean-up" doctrine, I decline to do so.  The "clean-up" doctrine serves the important function of avoiding, when appropriate, piecemeal litigation, but the historical imperative that a jury, not a judge, should evaluate whether a defendant's statements are defamatory shines even brighter.[103]

In view of this historical imperative, I conclude this Court lacks subject matter jurisdiction to adjudicate Count VIII and Defendants' arguments that it fails to allege defamatory statements.  Count VIII is dismissed, subject to Tygon Peak's right under 10 *Del. C.* § 1902 to transfer the claim to Superior Court.[104]

### III.    RULE 12(B)(6)

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

---

[102] *Id.* at \*14 (emphasis added) (internal quotation marks omitted) (quoting *Perlman*, 2019 WL 2647520, at \*1); *see also id.* ("Suffice it to say that issues of falsity and malice are for the collective wisdom of a jury rather than a judge as the sole arbiter of defamation and libel." (alterations and internal quotation marks omitted) (quoting *Perlman*, 2019 WL 2647520 at \*5)).

[103] *Id.*

[104] *See* 10 *Del. C.* § 1902.

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[105]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[106] This standard is "minimal"[107] and "plaintiff-friendly."[108] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[109] Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[110] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[111]

---

[105] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[106] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[107] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[108] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8–9 (Del. Ch. July 24, 2009).

[109] *Cent. Mortg. Co.*, 27 A.3d at 536.

[110] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[111] *Trados*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

## A. Count I Fails To State A Claim For Breach Of The Term Sheet.

Count I, for breach of the Term Sheet for failure to reimburse Tygon Peak for Rush Street's fees, is pled "against Defendant Rock Wave Capital."[112] It alleges that "in refusing to cause Voice Comm to reimburse Tygon Peak for amounts paid to, and expenses incurred in connection with . . . the Rush Street Agreement, Rock Wave Capital has breached the Term Sheet."[113]

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[114] Whether Tygon Peak states a claim for breach of contract turns on questions of contract interpretation. "To determine what contractual parties intended, Delaware courts start with the text."[115] In doing so, the Court aims to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[116] "Delaware adheres to the objective theory of contracts,

---

[112] SAC Ct. 1.

[113] SAC ¶ 173; *see also* SAC ¶¶ 64–65.

[114] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[115] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[116] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[meaning that] a contract's construction should be that which would be understood by an objective, reasonable third party."[117] The Court will "give effect to the plain-meaning of the contract's terms and provisions," "will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[118] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[119]

Defendants seek dismissal of Count I for two primary reasons. First, they argue that the Term Sheet is no longer operative, due to the integration clause in the Investco LLC Agreement. Alternatively, even if the Term Sheet continues to bind the parties, Defendants argue that Tygon Peak sued the wrong defendant, as the Term Sheet provides that Voice Comm, not Rock Wave Capital, must reimburse Tygon Peak. After considering the relevant contract language, I conclude that the Term Sheet remains operative, but I dismiss Count I because Tygon Peak has failed to

---

[117] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[118] *Id.* at 1159–60 (internal quotation marks omitted) (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[119] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

plead grounds for holding Rock Wave Capital liable for any failure to reimburse

Tygon Peak under the Term Sheet.

1. **The Term Sheet Remains Operative, Despite The Integration Clause in the Investco LLC Agreement.**

"A binding completely integrated agreement discharges prior agreements to

the extent that they are within its scope."[120]  "Clauses indicating that the contract is

an expression of the parties' final intentions generally create a presumption of

integration."[121]  Integration clauses frequently contain language limiting their scope

to agreements "between the parties,"[122] or to those made "with respect to the subject

matter hereof."[123]  Ultimately, an integration clause is interpreted just like any other

---

[120]*Quantlab Gp. GP, LLC v. Eames*, 2019 WL 1285037, at \*4 n. 30 (Del. Ch. Mar. 19, 2019) (quoting Restatement (Second) of Contracts § 213(2) (1981)), *aff'd*, 222 A.3d 580 (Del. 2019) (TABLE).

[121] *Addy v. Piedmonte*, 2009 WL 707641, at \*9 (Del. Ch. Mar. 18, 2009).

[122] *See, e.g.*, *id.*, at \*9 n. 46 ("This Agreement: (a) embodies the entire agreement ***between the Parties***, supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed jointly by the Manager of each Party.") (alterations and internal quotation marks omitted) (emphasis added); *Hynansky v. Vietri*, 2003 WL 21976031, at \*4 (Del. Ch. Aug. 7, 2003) ("This Agreement contains the entire understanding ***between the parties*** with respect to the Partnership and supercedes [sic] all prior written and oral agreements between them." (internal quotation marks omitted) (emphasis added)).

[123] *See, e.g.*, *Finger Lakes Cap. P'rs, LLC v. Honeoye Lake Acq., LLC*, 2015 WL 6455367, at \*18 (Del. Ch. Oct. 26, 2015) ("The plain language of the integration clause in the Revolabs Agreement stated that it superseded all prior agreements ***with respect to the subject matter hereof***." (emphasis added) (internal quotation marks omitted)), *aff'd in part, rev'd in part*, 151 A.3d 450 (Del. 2016).

contract: "[a]n integration clause should be interpreted according to its plain meaning when its terms are unambiguous."[124]

The integration clause in the Investco LLC Agreement, Section 12.4(a), provides:

> Entire Agreement. This Agreement, together with its schedules and appendices, and together with the Certificate, constitutes the entire agreement **between the Members with respect to its subject matter**, and supersedes any and all other prior agreements and undertakings with respect to such subject matter among them. No Member is making any guarantee, promise, or undertaking any obligation to or with respect to the LLC that is not expressly contained in this Agreement.[125]

By its plain language, this provision does not reach the Term Sheet, which is between Rock Wave Capital and Tygon Peak.[126] Rock Wave Capital is not a member of Investco, or even a signatory to the Investco LLC Agreement.[127] The Term Sheet is therefore not an agreement "between the Members" of Investco. Because the Term

---

[124] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 823 (Del. Ch. 2020) (citations, alterations, and internal quotation marks omitted) (quoting *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013); *see also, e.g.*, *James v. United Med. LLC*, 2017 WL 1224513, at *5–6 (Del. Super. Mar. 31, 2017) (applying contract interpretation principles to the language of an integration clause). *Cf. Quantlab*, 2019 WL 1285037, at *4 (discussing the role of parol evidence in determining whether a contract is completely or partially integrated).

[125] Investco LLC Agr. § 12.4(a) (emphasis added); *see also* Investco LLC Agr., App. A at 3–4 (defining "Members").

[126] Term Sheet 1, 8.

[127] *See* SAC ¶¶ 11–17; *see also* Investco LLC Agr. App. A at B-3–B-4 (defining "Members"); *id.* 34–49 (listing signatories). Voice Comm, the entity responsible for reimbursing Tygon Peak under the Term Sheet, is also not a member of Investco.

Sheet is outside Section 12.4(a)'s scope, it is not affected by the Investco LLC

Agreement and remains operative, to the extent its terms are binding.[128]

### 2. Rock Wave Capital Is Not Obligated To Cause Voice Comm To Reimburse Tygon Peak Under The Term Sheet.

Though the Term Sheet was not superseded by the Investco LLC Agreement,

Rock Wave Capital is not responsible for Tygon Peak's reimbursement thereunder.

Regarding expenses, the Term Sheet provides:

> Expenses: At closing, the Target [Voice Comm] will reimburse [Tygon] Peak, Investco and each Member and their respective affiliates for any costs and expenses of such persons or entities and their respective affiliates (including fees and expenses of attorneys, accountants, consultants, and out of pocket expenses of such persons or entities and their respective affiliates) incurred in connection with the transactions contemplated by this Term Sheet. If the Closing does not occur, each Member will be responsible for their own broken deal costs.[129]

The plain language of this provision makes clear that Voice Comm, not Rock Wave

Capital, is responsible for reimbursing Tygon Peak's expenses. Tygon Peak

acknowledges this provision, and admits that money reimbursing it for expenses

under the Term Sheet must necessarily come from Voice Comm.[130] And Tygon

---

[128] The Term Sheet is non-binding, except with respect to the "Confidentiality," Expenses," and "Exclusivity" sections. Term Sheet 6. The "Expenses" section is at issue here and is "intended to be legally binding on [Rock Wave Capital] and [Tygon] Peak." *Id.*

[129] *Id.* 5 (formatting altered).

[130] *See* Hr'g Tr. 55.

Peak does not point to a provision in the Term Sheet that compels Rock Wave Capital to "cause Voice Comm to reimburse Tygon Peak."[131]

Instead, Tygon Peak relies on agency principles, arguing that Rock Wave Capital must cause Voice Comm to pay because Voice Comm is Rock Wave Capital's subsidiary.[132] Tygon Peak argues the Court should "attribute the actions of a subsidiary company to its parent," and hold Rock Wave Capital responsible for Voice Comm's reimbursement obligations.[133] Tygon Peak's legal theory is a poor fit for these facts: it is impossible to apply a traditional agency analysis to Rock Wave Capital and Voice Comm at the time of the Term Sheet, which was signed before Voice Comm was created.[134]

---

[131] *See* SAC ¶ 173; *see also id.* ¶¶ 64–65.

[132] *See* D.I. 92 at 40–41.

[133] *See id.* (quoting *Chrysler Corp. (Delaware) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1035 (Del. 2003)).

[134] *Compare* Term Sheet 8, *with* SAC ¶ 33; *see Boulden v. Albiorix, Inc.*, 2013 WL 1455826, at *1 (Del. Ch. Apr. 10, 2013) ("[O]ne cannot act as the agent of a nonexistent principal.").

     To fill this gap, and to allow a nascent entity to "procure . . . the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business," Delaware has adopted the doctrine of promoter liability for preincorporation agreements. *See Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 584 (Del. Ch. 1948) (citing *Henderson v. Plymouth Oil Co.*, 131 A. 165, 170 (Del. Ch. 1925); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 744 (Del. 2006). Under this framework, in certain circumstances, "promoters who execute a preincorporation contract in the name of a proposed corporation are personally liable on the contract even though they assume they are acting on behalf of a proposed corporation, and notwithstanding that they acted solely in contemplation of the formation of the corporation." *Boulden*, 2013 WL 1455826, at *1; *see also GS Petroleum, Inc. v. R & S Fuel, Inc.*, 2009 WL 1554680, at *2–3 (Del. Super. June 4, 2009) (suggesting that

Tygon Peak's agency theory is also belied by its allegations. Tygon Peak concludes Voice Comm is Rock Wave Capital's subsidiary because Rock Wave Capital is the "majority owner of Voice[]Comm's shares"[135] with "ultimate control of Voice[]Comm through its control of the [Investco Board and the Mobile Board]."[136] But Tygon Peak does not allege that Rock Wave Capital owns any interest, never mind a controlling interest, in Voice Comm, Investco, or Mobile. Rock Wave Capital's affiliate, Rockwave VC, holds a majority stake in Investco. But Tygon Peak has not pled that Rockwave VC and Rock Wave Capital are indistinguishable, nor that Rockwave VC's Investco stake translates to control of Mobile or Voice Comm.[137] In short, Tygon Peak has not pled that Rock Wave Capital controls Voice Comm.

---

promoters can be released from liability if certain preconditions are satisfied, and citing treatises); *Grunstein v. Silva*, 2009 WL 4698541, at *18 (Del. Ch. Dec. 8, 2009) ("The Defendants argue that entities created after the supposed Partnership Agreement cannot be subject to that agreement, and point to the general rule that business entities are not liable for the contracts of their promoters prior to incorporation. However, under Delaware law, if the subsequently formed entity implicitly adopts the pre-formation agreement by accepting its benefits with knowledge of its terms, the entity may be bound by that agreement."). But Tygon Peak does not assert Rock Wave Capital is liable for failing to reimburse Tygon Peak as Voice Comm's promoter. So I do not address Rock Wave Capital's promoter liability.

[135] D.I. 92 at 41 (citing SAC ¶¶ 64–65).

[136] SAC ¶ 64.

[137] Rockwave VC holds a 61.8% interest in Investco. *Id.* ¶ 12. When Tygon Peak originally filed this action, Investco was Mobile's 80% majority member. *Id.* ¶ 9. But as of September 2020, Investco held only a 48.4% stake in Mobile (which in turn owns Voice Comm). SAC Ex. I at 6. Even though Rockwave VC could control Investco, Investco is now a minority member in Mobile, and Tygon Peak offers no other allegations that

36

To summarize, Count I's claim against Rock Wave Capital for breach of the Term Sheet fails. Even though the Term Sheet remains operative, its plain language requires Voice Comm to reimburse Tygon Peak—not Rock Wave Capital. The Second Amended Complaint does not plead that Rock Wave Capital has any duty, by contract or by agency principles, to "cause Voice Comm to reimburse Tygon Peak." The Motion is granted with respect to Count I.

## B. Count II Fails To State A Claim For Unjust Enrichment.

Count II alleges that allowing the Entity Defendants "to retain the benefit of the services provided by Rush Street and of Tygon Peak's payments to Rush Street and expenses incurred in connection with the Rush Street Agreement would unjustly enrich [the Entity Defendants] to the detriment of Tygon Peak."[138] Defendants argue that Count II must be dismissed because this issue is governed by contract, namely the Term Sheet.[139] I agree.

---

Rockwave VC controls Voice Comm through Investco. That Rockwave VC and Rock Wave Capital's common principal, Goldberg, sits on both the Investco Board and the Mobile Board does not change this result. And Tygon Peak does not allege that Goldberg, as one of four members on both boards, controls those boards.

[138] SAC ¶ 177.

[139] D.I. 88 at 31–34.

Unjust enrichment is "a theory of recovery to remedy the absence of a formal contract."[140] "Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[141] Under Delaware law, the elements of unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[142] If the parties' relationship is comprehensively governed by contract, a claim for unjust enrichment will be dismissed because the "contract is the measure of plaintiffs' right."[143] While unjust enrichment may be pleaded as an alternative theory of recovery to a breach of contract claim, the right to do so "does not obviate the obligation to provide factual support for each theory" independently.[144] To survive a motion to dismiss,

---

[140] *Choupak v. Rivkin,* 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015) (internal quotation marks omitted) (quoting *ID Biomedical Corp. v. TM Techs., Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)).

[141] *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *6 (Del. Ch. Oct. 30, 2015) (internal quotation marks omitted) (quoting *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 891–92 (Del. Ch. 2009)).

[142] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[143] *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del. 1979); *accord Kuroda*, 971 A.2d at 891 ("Thus, when the complaint alleges an express, enforceable contract that controls the parties' relationship a claim for unjust enrichment will be dismissed." (quoting *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (alterations and internal quotations omitted)).

[144] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009); *see also Doberstein*, 2015 WL 6606484, at *6; *CMS*

38

Tygon Peak's unjust enrichment claim cannot be duplicative of its accompanying breach of contract claim.[145]

Tygon Peak's right to reimbursement for expenses generated with Rush Street is governed by contract, specifically the Term Sheet's "Expenses" section. Because I have found that the Term Sheet survives the integration clause in the LLC Agreement, and because the "Expenses" term is binding, there can be no question that Tygon Peak's right to reimbursement is comprehensively addressed in "an express, enforceable contract that controls the parties' relationship."[146] In other words, "the [Term Sheet] is the measure of [Tygon Peak's] right."[147] The allegations supporting Count I's breach of contract claim are substantially duplicated in Count II's unjust enrichment claim, and both stem from the same underlying facts.[148] Such duplicative claims cannot stand.[149]

This conclusion holds even though many of the Entity Defendants named in Count II are not parties to the Term Sheet. The Term Sheet explicitly provides that Voice Comm, not any of the other Entity Defendants, will be responsible for

---

*Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *17 (Del. Ch. June 23, 2015); *Lyons Ins. Agency, Inc. v. Kirtley*, 2019 WL 1244605, at *2 (Del. Super. Mar. 18, 2019).

[145] *See, e.g.*, *CMS*, 2015 WL 3894021, at *17.

[146] *See Kuroda*, 971 A.2d at 891.

[147] *Wood,* 401 A.2d at 942.

[148] *Compare* SAC ¶¶ 169–73, *with id.* ¶¶ 174–78.

[149] *See CMS*, 2015 WL 3894021, at *17.

reimbursing Tygon Peak's expenses.[150] It is well-settled that Tygon Peak may not use a claim for unjust enrichment "to circumvent basic contract principles recognizing that a person not a party to a contract cannot be held liable to it."[151] The Motion is granted with respect to Count II.

## C. Count III States A Claim For Breach Of The MSA.

Count III alleges Mobile breached the MSA by not paying Tygon Peak the Annual Management Fee. Specifically, Tygon Peak claims that on July 1, 2019, "Mobile stopped paying Tygon Peak the management fees to which Tygon Peak is entitled under the MSA despite acknowledging that 'the MSA remains in full force and effect.'"[152] Defendants attack Count III by arguing the MSA conditions the Annual Management Fee on Mobile requesting services from Tygon Peak, and that because the Second Amended Complaint does not specifically plead that any services were requested in July 2019, the fee is not owed and nonpayment is not a breach.[153] Tygon Peak contends that the Annual Management Fee "is not

---

[150] Term Sheet 5.

[151] *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007) (alterations and internal quotation marks omitted) (citing *WSFS v. Chillibilly's, Inc.*, 2005 WL 730060, at *19 (Del. Super. Mar. 30, 2005)); *see also Kuroda*, 971 A.2d at 891–92 (citing *MetCap* and holding, "Thus, [plaintiff] cannot use a claim for unjust enrichment to extend the obligations of a contract to [defendants] who are not parties to the contract. Accordingly, plaintiff's claim for unjust enrichment must be dismissed.").

[152] SAC ¶ 186.

[153] *See* D.I. 88 at 34–35.

conditioned upon and does not vary upon the amount or type of services to be provided, but rather it is a fixed fee in exchange for Tygon Peak's commitment to provide services as and when requested by Mobile or its subsidiaries."[154]

Two sections of the MSA are at issue. Section 2(B) provides, in relevant part:

> In exchange for the services provided to [Mobile] hereunder, *as more fully described in Section 1 of this Agreement*, during the Term, [Mobile] will pay or cause to be paid to [Tygon Peak] an *annual management fee* equal to Three Hundred Thousand Dollars ($300,000) (the "Annual Management Fee") *in advance in quarterly installments* upon the last day of each March, June, September and December (with the first such quarterly installment hereunder being payable on September 30, 2018).[155]

The referenced Section 1(A) provides:

> [Tygon Peak] agrees that, during the term of this Agreement (the "**Term**"), it will, *at the request of the Company's [Mobile's] board of managers* (the "**Board**") and/or the boards of managers or boards of directors (or similar governing bodies) of the Company's subsidiaries and/or Affiliates . . . provide the Company and its subsidiaries with [certain enumerated services].[156]

I agree with Tygon Peak. The Annual Management Fee is a flat "annual" fee.[157] Mobile must pay Tygon Peak "in advance in quarterly installments."[158] Section 1(A) defines Tygon Peak's obligations, and Section 2(B) defines Mobile's

---

[154] SAC ¶ 69.

[155] MSA § 2(B) (emphasis added).

[156] *Id.* § 1(A) (emphasis added); *see also id.* § 1(A)(i)–(xii) (enumerating services).

[157] *See id.* § 2(B).

[158] *See id.*

obligations. Neither Section 2(B) nor Section 1(A) specifies that a request for Tygon Peak's services is a condition precedent on Mobile's obligation to pay.[159] Rather, Mobile must pay "in advance."[160] Section 2(B) indicates Mobile's payments are "in exchange" for Tygon Peak's services, which are in turn outlined in Section 1.[161] Section 1(A) refers to services "at the request of [the Mobile Board]" to define the scope of Tygon Peak's obligations;[162] that phrase does not condition Mobile's advance payments.

Interpreting Section 1(A) as defining the scope of Tygon Peak's obligations, rather than as a condition on Mobile's, does not rob Section 1(A) of meaning as Defendants suggest. Tygon Peak's obligations to Mobile are still defined by the contours of Section 1(A) and any requests Mobile makes for management services. Mobile's obligations in Section 2(B) are not so limited. Part of Tygon Peak's service is its constant obligation and readiness to respond to the Mobile Board's requests;[163] its flat fee consideration, paid in advance, rightfully reflects that commitment.

---

[159] In Delaware, "[c]onditions precedent are not favored in contract interpretation because of their tendency to work a forfeiture." *Stoltz Realty Co. v. Paul*, 1995 WL 654152, at *9 (Del. Super. Sept. 20, 1995).

[160] MSA § 2(B).

[161] *See id.*

[162] *Id.* § 1(A).

[163] *See* MSA § 1(A)(i)–(xii).

Defendants' reading ignores that practical and common structure.[164]  It is also not clear as a practical matter that a flat fee, paid in advance, could be conditioned on subsequent requests for services.

In short, the Annual Management Fee is a fixed retainer, neither conditioned on nor varying with Mobile's requests for services.  Under that construction, the Second Amended Complaint's allegation that Mobile did not make the required installment payment by July 1 states a claim for breach of contract.  The Motion is denied with respect to Count III.

### D.    Count IV:  Breach Of Contract

Count IV alleges Investco breached three sections of the Investco LLC Agreement:  Section 5.10's supermajority approval provision, Section 6.3's advance notice provision, and Section 5.12's prohibition on bad faith circumvention of Class A distributions.  Tygon Peak alleges the 2019 Offering, the 2020 Offering, the Option, and the Equity Interest Grant breached all three provisions.  I address each provision in turn, applying Delaware's well-understood contract interpretation principles to the Investco LLC Agreement.[165]

---

[164] *See, e.g.*, *Reith v. Lichtenstein*, 2019 WL 2714065, at *3 (Del. Ch. June 28, 2019) (describing a "fixed monthly fee" arrangement under a management services agreement).

[165] *Kuroda*, 971 A.2d at 880–81 ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members.  Among other things, a company's LLC agreement defines when members of the LLC can be liable for breach of provisions of that agreement.  Accordingly, as with any contract, the Court must look to

### 1. Count IV States A Claim For Breach Of Section 5.10 Of The Investco LLC Agreement.

Tygon Peak alleges four potential breaches of Section 5.10: the 2019 Offering, the 2020 Offering, the Equity Interest Grant, and exercising the Option. Via a bench ruling at argument, I explained the 2019 Offering did not breach Section 5.10.[166] Here, I focus on the newer bases for Tygon Peak's claims.

Section 5.10 states:

> Supermajority Approval Rights. Notwithstanding anything to the contrary contained in this Agreement, the LLC shall not, and shall not permit any Affiliate of the LLC to, and the Board shall not have the authority to, without the approval of a Supermajority of the Board:
>
> (a) Subject to Section 6.6,[167] enter into, amend or modify any agreement or transaction between the LLC and any Manager, or Member, or any Affiliate of any of them (excluding, for purposes of this Section 5.10(a), any Transfer permitted by ARTICLE 8),[168]

---

the language of the LLC Agreement to determine the potential liabilities of the parties. In analyzing a contract on a motion to dismiss under Rule 12(b)(6), the Court must interpret ambiguous provisions in the light most favorable to the nonmoving party.").

[166] *See* Hr'g Tr. 6–9.

[167] This carve out for management agreements is not applicable here. *See* Investco LLC Agr. § 6.6 ("Management Agreement. Notwithstanding Section 5.10(a), the Board may approve a management agreement with one or more of the Members or its Affiliates to provide services to the LLC without the consent of the Members." (formatting altered)).

[168] Article 8, which governs "Transfers of Membership Interests; Member Withdrawal; Admission of Additional/Substitute Members," is similarly inapplicable. *See id.* Art. 8.

(b) redeem, repurchase or otherwise acquire any Units or any securities directly or indirectly convertible, exercisable or exchangeable for Units, except if the holders of Class B Units and Class A Units have the right to participate in such redemption, repurchase or acquisition with respect to a pro rata number of their Class B Units or Class A Units, as the case may be; provided, that the proceeds received in connection with the redemption shall be distributed to the holders of the redeemed Units in accordance with Section 3.1,

(c) declare or make any distribution with respect to the LLC in violation of ARTICLE 3,

(d) approve a Sale of the LLC if, in connection with such Sale of the LLC, the Majority Members exercise their Drag-Along Right in bad faith and with the sole purpose of avoiding paying or minimizing distributions to holders of Class A Units hereunder, or

(e) amend the formation documents of the LLC or any of its Subsidiaries, including their respective certificates of formation, limited liability company or other operating agreements (including this Agreement), and any other documents relating to the governance and/or ownership of such entity, except as required by applicable law or as would not materially and disproportionately adversely affect the rights or privileges of the Class A Members under this Agreement.[169]

As defined in the Investco LLC Agreement, "Supermajority of the Board" "means a majority of the Board that includes the Class A Manager," namely Tygon Peak's principal, Narulla.[170]

---

[169] *Id.* § 5.10(a)–(e) (formatting altered).

[170] *See id.* § 5.1(c).

Tygon Peak focuses on Section 5.10(a), which requires Narulla's approval for transactions with Investco's managers, members, or any of their "Affiliates," broadly defined:

> "Affiliate" means, with respect to any Person: (i) any other Person directly or indirectly controlling, controlled by or under common control with such Person; and/or (ii) any spouse, ancestor, child (including by adoption) or other lineal descendant, sibling or in-law of such Person or of any other Person (who is a natural person) who is an Affiliate of such Person and described in clause (i) above.[171]

Thus, the relevant question is whether the 2020 Offering required Investco to "enter into, amend or modify any agreement or transaction between the LLC and any Manager, or Member, or any Affiliate of any of them."[172] If it did, then consummating it without Narulla's approval breached Section 5.10(a).

Through the 2020 Offering, Investco entered into transactions with its Class B members. As I explained in my partial bench ruling, Section 5.10(a) applies to a situation where Investco enters into or modifies a bilateral arrangement, agreement, or transaction with one of its members or managers (or their affiliates).[173] In the 2020 Offering, Investco sold new Class B units to its existing members. By the plain

---

[171] *Id.* App. A at B-1. "Person" is defined to include both natural people and entities. *See id.* App. A at B-4 ("'Person(s)' means any individual(s) who is (or are) a natural person, partnership(s), limited liability company (or companies), limited liability partnership(s), limited partnership(s), corporation(s), trust(s) and any other association or legal entity.").

[172] *Id.* § 5.10(a).

[173] *See* Hr'g Tr. 8; Investco LLC Agr. § 5.10(a).

language of Section 5.10(a), such sales required Investco to enter into transactions with its members.

Defendants do not engage with the plain meaning; rather, they argue that the 2020 Offering could not have violated Section 5.10(a) because other provisions of the Investco LLC Agreement contemplate the Investco Board could issue new securities through a "preemptive rights sale."[174] This position is inconsistent with the Investco LLC Agreement's plain text. Section 5.10 operates "notwithstanding anything to the contrary contained in this Agreement."[175] Thus, Section 5.10(a)'s supermajority requirement operates notwithstanding that Section 2.6 contemplates a preemptive rights sale and that Section 2.1 authorizes Investco to issue new units. Had the drafters intended to carve out preemptive rights sales from Section 5.10(a), they could have explicitly done so, as they did for management agreements under Section 6.6 and transfers of interest under Article 8.[176] Section 5.10 prohibits

---

[174] *See* D.I. 88 at 37–42 (citing Investco LLC Agr. § 2.6). Section 2.6 provides notice and other requirements in the event Investco issues "New Securities" in a "Preemptive Rights Sale." Investco LLC Agr. § 2.6. Defendants also point to Section 2.1, which authorizes Investco "to issue an unlimited number of Units and to create new classes of Units." *Id.* § 2.1; s*ee also* Hr'g Tr. 21–23. These provisions are distinguishable from those in *Terramar Retail Centers, LLC v. Marion #2-Seaport Trust*, which Defendants cite. 2019 WL 2208465, at *23 (Del. Ch. May 22, 2019), *aff'd* 222 A.3d 581 (Del. 2019). More importantly, the language Defendants cite from *Terramar* addressed the application of the implied covenant. *Id.*

[175] Investco LLC Agr. § 5.10.

[176] *See id.* Defendants also point out that Section 5.10(b) addresses and requires supermajority approval for certain redemptions and repurchases of stock. *See* D.I. 88 at 38–40. That certain transactions may be covered by multiple provisions of Section 5.10 is

Investco from entering into a transaction with a member without Tygon Peak's supermajority approval, even if another section addresses that same transaction.

Count IV also states a claim that exercising the Option under the Sharing Agreement breached Section 5.10. Defendants argue that exercising the preexisting Option did not cause Investco to enter into a new transaction that would trigger Section 5.10(a).[177] Their position is belied by the Sharing Agreement's terms. While Tygon Peak does not allege how Investco exercised the Option, the Sharing Agreement explains the procedure:

---

not dispositive and suggests that the parties took a "belt and suspenders" approach to drafting this provision. *See, e.g.*, *Lillis v. AT&T Corp.*, 2007 WL 2110587, at *15 (Del. Ch. July 20, 2007) ("The clause is best read as a belt-and-suspenders provision, included to insure that the adjustment would *fully* preserve the economic position of the options. Without the clause, a plausible, though incorrect, reading would be that an adjustment must be made, but it would not have to completely preserve the economic position of the options.").

[177] *See, e.g.*, Hr'g Tr. 18–19.

Exercise Procedure. The Option may be exercised by the Class A Members [Investco and KMD Weiss] upon an affirmative vote of a majority of the Class A Units, at any time upon the occurrence and continuation of an Insolvency Event upon delivery by [Investco] of a written exercise notice to the Noteholder [Voice Comm] (an "Exercise Notice") providing that the Class A Members have elected to exercise the Option. In the event the Class A Members elect to exercise the Option, *the Class A Members and Noteholder agree to enter into an exchange agreement in such form as shall be reasonably agreed by the Class A Members and the Noteholder, to effectuate the Exchange* (the "Exchange Agreement"). The Exchange Agreement shall provide for a closing date not more than three (3) days following delivery of the Exercise Notice to the Noteholder. For the avoidance of doubt, the rights and obligations incident to the Note and the Class A Shares will be transferred as of the date of the Exercise Notice and the Noteholder and Class A Members will hold the rights of the Note and the Class A Shares, respectively, in trust for the other party pending the closing of the Exchange.[178]

Thus, to exercise the Option, Investco needed to "enter into an exchange agreement" with KMD Weiss and Voice Comm.[179] KMD Weiss is a member of Investco, and Voice Comm is an "Affiliate" of Investco and its members.[180] When Investco struck an "Exchange Agreement" with those entities to facilitate its exercise of the Option, it triggered Section 5.10(a)'s supermajority approval requirement. And when it consummated that transaction without Narulla's approval, it breached that provision.[181]

---

[178] Sharing Agr. § 2(c) (emphasis added).

[179] *See id.*

[180] *See* Investco LLC Agr. § 5.10(a); *id.*, App. A at B-1.

[181] *See* SAC ¶¶ 7 n.1, 131–34.

The Second Amended Complaint does not mention Investco entering into an "Exchange Agreement" to exercise the Option.[182]  But the absence of this allegation is not fatal.  "Delaware is a notice pleading jurisdiction.  Thus, for a complaint to survive a motion to dismiss, it need only give general notice of the claim asserted."[183]  Tygon Peak enjoys the benefit of all reasonable inferences in its favor.[184]  It is reasonable to infer from the Sharing Agreement, attached to the Second Amended Complaint, that Tygon Peak's specific allegation that Investco "exercised the Option"[185] means it entered into an exchange agreement, in conformity with the Sharing Agreement's procedures.  Defendants are on notice of such a claim, even in the absence of a specific allegation that an exchange agreement was actually reached.  Insofar as it seeks to dismiss this claim, the Motion is denied.

Finally, Count IV fails to state a claim that the Equity Interest Grant breached Section 5.10.  In the Equity Interest Grant, Investco transferred 3% of its Mobile stake to Graycliff Partners, a nonparty bank and Voice Comm's creditor.[186]  Graycliff Partners is not one of Investco's members, nor is it a manager.  Nor is there

---

[182] *See generally id.*

[183] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (footnotes and internal quotation marks omitted) (citing *VLIW Tech.*, 840 A.2d at 611 then quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)); *accord Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 262 (Del. Ch. 2021).

[184] *Savor*, 812 A.2d at 897.

[185] SAC ¶ 151; *see also id.* ¶¶ 7 n.1, 53, 154.

[186] *See id.* ¶¶ 129, 150, 189, 192, 194.

any allegation that it is an "Affiliate" of any entity or person that is. Tygon Peak does not address these deficiencies.[187] Insofar that it alleges the Equity Interest Grant violated Section 5.10, Count IV is dismissed.

In sum, Count IV states a claim for breach of Section 5.10 with respect to the 2020 Offering and exercising the Option; Tygon Peak's other theories for breach of Section 5.10 are not viable.

### 2. Count IV Fails To State A Claim For Breach Of Section 6.3 Of The Investco LLC Agreement.

Count IV also alleges that the 2019 Offering, the 2020 Offering, and the related purchase of the Tessco Assets breached Section 6.3 of the Investco LLC Agreement. Under Section 6.3, if the LLC's members act by written consent, the LLC must provide all members with at least twenty-four hours' advance notice:

---

[187] *See* D.I. 92 at 52. Instead, Tygon Peak argues the Equity Interest Grant violates Section 5.10 "because Plaintiff alleged the Equity Interest Grant was through Mobile and that Mobile is a member." *Id.* This argument is a nonsequitur: the Equity Interest Grant conveyed Mobile shares, but Mobile was not a party to that transaction. *See* SAC ¶ 150 (alleging the Investco Board resolved to transfer 3% of Investco's Mobile Class A Units to affiliates of Graycliff Partners). A transaction between Investco and Graycliff transferring Mobile shares is not a transaction "between [Investco] and any Manager, or Member, or any Affiliate of any of them." *See* Investco LLC Agr. § 5.10. Tygon Peak also alleges the Equity Interest Grant was designed to induce Graycliff to amend its debt financing arrangements with Mobile, but that purpose does not change the fact that the Equity Interest Grant itself was between Graycliff and Investco. *See* SAC ¶ 150.

> Written Consent to Action. Any action required or permitted to be taken *by the Members* (or by any Members), whether at a meeting or otherwise, may be taken without a meeting; provided, that twenty-four (24) hours' advance e-mailed notice of the action to be taken is first given to all Members, and the action is evidenced by a written consent or other written instrument dated and signed (whether or not in counterparts and whether or not through facsimile or e-mail copies) by that Member or those Members (or its or their designated representative) necessary to authorize or take the action that is the subject of such written consent. All such written Member consent(s) shall be delivered to the LLC at its principal office. The Board, within thirty (30) days after the LLC obtains authorization to the taking of any action by a written consent of the Members, shall send a copy thereof to that Member (or those Members), if any, who (or whose designated representative) did not execute the same (or, otherwise, consent, in writing, to the action (or actions) that is (or are) the subject thereof).[188]

The parties disagree whether the 2019 Offering and the 2020 Offering triggered Section 6.3's notice requirement. This issue turns on whether these offerings were actions "taken by the Members"[189] or, as Defendants argue, by the Investco Board.

The 2019 Offering and 2020 Offering were both executed by the Investco Board managers, in their capacities as such. The October 11 written consent authorizing the 2019 Offering is titled, "Written Consent of The Board of Managers of [Investco]."[190] The written consent continues: "The undersigned, constituting a majority of the members of the Board of Managers . . . do hereby consent to and adopt the following resolutions without a meeting pursuant to . . . Section 5.8 of the

---

[188] Investco LLC Agr. § 6.3 (formatting altered) (emphasis added).

[189] *Id.*

[190] SAC Ex. D at 1.

[Investco LLC Agreement]."[191]  The written consent authorizing the 2020 Offering contains similar language:  it is also titled "Written Consent of The Board of Managers of [Investco]" and indicates "[t]he undersigned, constituting a majority of the members of the [Investco] Board of Managers . . . do hereby consent to and adopt the following resolutions without a meeting pursuant to . . . Section 5.8 of the [Investco LLC Agreement]."[192]

The "Notice of Proposed Issuance" for the 2019 Offering also states that "the Board of Managers of [Investco] has approved an issuance," further indicating that 2019 Offering occurred as the result of board, rather than member, action.[193]  Indeed, the Second Amended Complaint pleads that the Investco Board managers, not Investco's members, proposed the 2019 Offering.[194]

Tygon Peak argues that Investco Board managers "are the Members,"[195] and so the 2019 Offering and 2020 Offering each triggered Section 6.3.  This is incorrect.

---

[191] *Id.*  Section 5.8 of the Investco LLC Agreement provides for a majority of the Investco Board to act without a meeting.  *See* Investco LLC Agr. § 5.8.  I discuss that provision in more detail below.

[192] SAC Ex. J at 1.  As explained in more detail below, Tygon Peak confoundingly declined to argue the 2020 Offering violated Section 5.8.

[193] *See* SAC Ex. E at 1.

[194] *E.g.*, SAC ¶ 92 ("Following through on Goldberg's threats, Investco's Board of Managers (through a Written Consent executed by the Investco Board Defendants) resolved to sell new equity in Investco from which Investco would use the proceeds to purchase new Class A Units in Mobile.").

[195] D.I. 92 at 52 (emphasis removed).

Investco's members are entities (Rockwave VC, Seven Shores, and Old Mill, plus Tygon Peak),[196] while its managers are "four (4) natural persons" (Goldberg, Caplan, Thorsberg, and Narulla).[197] Though the human managers may themselves be members of Investco's member entities, Delaware law clearly and consistently respects the "separate juridical existence" of an LLC and its members.[198]

The written consents make clear the Individual Defendants acted as Investco Board managers, not as representatives of Investco's members, in consenting to the 2019 and 2020 Offerings.[199] This is an important distinction in the Investco LLC Agreement. Section 6.3 governs "Written Consent to Action" "taken by the Members," while Section 5.8 governs "Action Without a Meeting," *i.e.*, written consent, by a majority of the Investco Board managers.[200] The Investco LLC

---

[196] SAC ¶¶ 12–13, 17.

[197] *See* Investco LLC Agr. § 5.1; *see also* SAC ¶¶ 14–16, 102–05.

[198] *See, e.g.*, *Wood v. U.S. Bank Nat'l Ass'n*, 246 A.3d 141, 148 (Del. Ch. 2021) ("The Delaware Uniform Limited Liability Act . . . makes clear that an LLC has a separate juridical existence distinct from its members. . . . This means that the LLC has an existence recognized by law as distinct from that of its members and others just as a corporation is recognized as having a legal existence separate and apart from its stockholders." (citations, alterations, and internal quotation marks omitted) (citing 6 *Del C.* § 18-201(b), and then quoting Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 2.05, at 2-20 (2019))).

[199] SAC Ex. D at 1; SAC Ex. J at 1.

[200] Investco LLC Agr. § 6.3; *id.* § 5.8. ("<u>Action Without a Meeting</u>. Any action required or permitted to be taken by the Board, whether at a regular or special meeting thereof or otherwise, may be taken without a meeting; provided, that twenty-four (24) hours' advance e-mailed notice of the action to be taken is first given to all Managers, and the action is approved in writing by a written consent or other written instrument signed by a majority of the Managers (whether or not in counterparts and whether or not through facsimile or

Agreement specifically enumerates this distinction between member written consents and manager written consents, and I cannot ignore it here. The Investco Board's written consents for both offerings specifically invokes Section 5.8.[201] Because that written consent was executed by the Investco Board, not by its members, it did not trigger Section 6.3's notice requirement.[202]

To the extent Tygon Peak contends Voice Comm's purchase of the Tessco Assets breached Section 6.3, that claim also fails.[203] Section 6.3 is in the Investco LLC Agreement and addresses written consents by Investco's members. Investco's members did not resolve for Investco to purchase the Tessco Assets; rather, Voice Comm bought them.[204] Investco's role in the Tessco transaction was the 2020 Offering, which, as I have explained, did not violate Section 6.3.

---

email copies). All such written consents shall be dated and shall be delivered to the LLC at its principal office. All such written consents shall have the same force and effect as a requisite vote of the Board at a meeting thereof duly called." (formatting altered)).

[201] SAC Ex. D at 1; SAC Ex. J at 1.

[202] Section 5.8 also contains a similar twenty-four hour notice requirement. *See* Investco LLC Agr. § 5.8. While less specific allegations that Defendants breached the Investco LLC Agreement by failing to give Tygon Peak twenty-four hour notice of the Offerings might have stated a claim, Tygon Peak specifically and repeatedly alleged that this failure breached Section 6.3, not Section 5.8. *See, e.g.*, SAC ¶¶ 114, 190. Tygon Peak has not alleged a breach of Section 5.8, and does not mention Section 5.8 in either its Second Amended Complaint or in its brief. *See generally id.*; D.I. 92. It would unfairly prejudice Defendants if I permitted a claim for breach of Section 5.8 to survive the Motion, where Tygon Peak has specifically and exclusively pled a breach of Section 6.3.

[203] *See* SAC ¶¶ 159, 193.

[204] *See id.* ¶ 149; SAC Ex. I at 4.

The Motion is granted with respect to Count IV's claim for breach of Section 6.3.

### 3. Count IV States A Claim For Breach Of Section 5.12 Of The Investco LLC Agreement.

Count IV also alleges the 2019 Offering, the 2020 Offering, the Equity Interest Grant, and exercising the Option breached Section 5.12 of the Investco LLC Agreement. That provision states:

> <u>No Circumvention of Class A Distributions</u>. Notwithstanding anything to the contrary contained in this Agreement, [Investco] shall not take any actions in bad faith with the specific intent of circumventing distributions to the Class A Members.[205]

Defendants contend Tygon Peak has failed to allege any of the complained-of actions were taken with this nefarious intent.

The pleading standard for a claim of "contractual 'bad faith'" is laid out in *Clean Harbors, Inc. v. Safety-Kleen, Inc.*[206] To survive a motion to dismiss, Tygon Peak "need only allege facts related to the alleged act taken in bad faith, and a plausible motivation for it. This is a minimal standard, the purpose of which is to give the defendant notice of the claim being made against it."[207] The pleading standard for a defendant's state of mind is rightfully lax, since alleging specific facts

---

[205] Investco LLC Agr. § 5.12 (formatting altered).

[206] 2011 WL 6793718, at *7 (Del. Ch. Dec. 9, 2011).

[207] *Id.* (internal quotations omitted) (quoting *Winston v. Mandor*, 710 A.2d 835, 844 (Del. Ch. 1997)).

may be "virtually impossible" at the pleading stage.[208] In *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,[209] the foundational case for the bad faith pleading standard, our Supreme Court reinstated a claim for bad faith based on a general allegation that the action in question was taken in bad faith and with retaliatory intent.[210] The Court went on to hold that "a fairly pleaded claim of good faith/bad faith raises essentially a question of fact which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery."[211]

Like the allegations in *Desert Equities*, and consistent with the pleading standard laid out in *Clean Harbors*, the Second Amended Complaint sufficiently

---

[208] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993).

[209] *Id.*

[210] *See id.* In *Desert Equities*, there were two general allegations, quoted in the opinion, that the Supreme Court found was sufficient to allege bad faith:

> [T]he General Partner has willfully, wrongfully and in bad faith excluded plaintiff from participating in three or more Fund II investments in retaliation for plaintiff's lawsuit against various Morgan defendants.
>
> . . .
>
> The General Partner has breached this implied covenant by reason of its wrongful exclusion of plaintiff from three or more investments of Fund II and its bad faith, retaliatory assertion that plaintiff's litigation concerning Fund I is a 'Material Adverse Effect' under Section 5.04 of the Partnership Agreement.

*Id.* (quoting complaint). As discussed above, these general allegations resemble those in the Second Amended Complaint.

[211] *Id.*

57

alleges contractual bad faith. Tygon Peak alleges that the 2019 Offering was done "in bad-faith and with the specific intent of circumventing Tygon Peak's promote . . . and stripping Tygon Peak of the rights that are tied to majority ownership of Class A Units."[212] According to the Second Amended Complaint, the 2019 Offering was one of the "alternative steps" the Investco Board took in its effort to oust Tygon Peak after buyout negotiations soured.[213] As alleged, the 2019 Offering offered new Class B units at the disproportionately low price of $1.00 per share,[214] and offered purchasers a corresponding number of Class A units for free.[215] It is reasonably conceivable that the purpose of this transaction was to give away Class A units at a below market price. Taken together,[216] these allegations clear the low bar of pleading bad faith circumvention of Tygon Peak's Class A distributions and a plausible motivation for that conduct.[217]

---

[212] SAC ¶¶ 191, 194, 197; *see also id.* ¶ 116.

[213] *See id.* ¶¶ 89, 91.

[214] When Tygon Peak initially invested, Investco valued its Class B units at $1,000 per unit. *Id.* ¶¶ 45, 47. In the 2020 Offering, the Investco Board also sold Class B units for $1,000 per unit. *See id.* ¶ 149; SAC Ex. J at 1.

[215] SAC ¶ 93.

[216] *Coca-Cola Beverages Fla. Hldgs., LLC v. Goins*, 2019 WL 2366340, at *3 (Del. Ch. June 4, 2019) ("At the pleadings stage, allegations of bad faith conduct should not be considered piecemeal, but instead should be considered in their totality." (citing *Klein v. Wasserman*, 2019 WL 2296027, at *5 & n.34 (Del. Ch. May 29, 2019))).

[217] *See Clean Harbors*, 2011 WL 6793718, at *7.

Moreover, the question of whether the 2019 Offering was done in bad faith is ill suited for resolution on a Rule 12 motion.[218] The determination of whether the October 2019 Offering was done in bad faith to circumvent Class A distributions or, as Defendants argue, for the innocuous purpose of raising capital and paying down debt is best resolved on a more developed record.[219] As alleged, it is reasonably conceivable that Defendants undertook the 2019 Offering to deliberately dilute Tygon Peak's Class A units and, in doing so, "circumvent[] a distribution to the Class A Members."[220] On that basis, the Motion is denied with respect to Count IV's Section 5.12 claim regarding the 2019 Offering.

Tygon Peak has also alleged the 2020 Offering, the Equity Interest Grant, and exercising the Option violated Section 5.12.[221] Tygon Peak has broadly asserted these transactions were intended to "wholly dilute and/or devalue Tygon Peak's ownership in Investco and Mobile and strip away the promote and key minority

---

[218] *See Desert Equities*, 624 A.2d at 1208. While *Desert Equities* was decided in the context of a Rule 12(c) motion for judgment on the pleadings, its reasoning is sensibly applied in the motion to dismiss context.

[219] *See* D.I. 88 at 47; *Desert Equities*, 624 A.2d at 1208.

[220] Investco LLC Agr. § 5.12; *see also id.* § 3.1 (explaining the distribution waterfall). Unlike Section 5.10, Section 5.12 is not limited to "enter[ing] into, amend or modify[ing] any agreement or transaction;" rather, it can be triggered by "any actions." *Compare id.* § 5.10(a), *with id.* § 5.12. Thus, the Investco Board's authorization of the 2019 Offering by written consent can still violate Section 5.12, despite its later withdrawal.

[221] *See* SAC ¶¶ 191, 194.

rights."[222] Tygon Peak has alleged these transactions diluted Tygon Peak's Class A interest; how or whether dilution occurred remains to be seen, but I accept Tygon Peak's allegation as true.[223] Tygon Peak has pled that these transactions diluted its Class A interest and that they were undertaken in bad faith. Count IV, as it pertains to Section 5.12, survives the Motion.

### E. Count V Fails To State A Claim For Breach Of The Implied Covenant.

Count V alleges that in devising the 2019 Offering, the 2020 Offering, and the "conduct related to [them], Investco, Rockwave VC, Seven Shores, and Old Mill breached the covenant of good faith and fair dealing that is implied in the Investco

---

[222] *Id.* ¶ 49.

[223] Defendants did not seek dismissal for failure to allege dilution or interference with distributions. That said, when pressed on this issue at argument, Tygon Peak's counsel was unable to explain how any 2020 transaction diluted its Class A units. Counsel acknowledged that it is not apparent from the transaction documents or the facts pled in the Second Amended Complaint that the 2020 Offering affected Tygon Peak's Investco Class A units. *See* Hr'g Tr. 45–52.

Dilution aside, it also appears these transactions could circumvent Tygon Peak's Class A distributions as required to breach Section 5.12 only indirectly. It appears Class B has a preferential cash distribution position over Class A. *See* Investco LLC Agr. § 3.1. As best I can tell at this stage, the 2020 Offering introduced more Class B units ahead of Class A in the distribution waterfall; and the Equity Interest Grant and Option reduced Investco's stake in Mobile and therefore, perhaps, Investco's cash available for distribution. *See* Investco LLC Agr. §§ 2(b), 1(d).

I also note that Tygon Peak alleges each transaction benefitted Investco, and in turn its investors. Exercising the Option allowed Investco to improve its priority within Mobile when Mobile's business was faltering. And Tygon Peak alleges that the Tessco Assets "add-on" financed by the 2020 Offering was "highly accretive" and "enhanced the value of the company." SAC ¶¶ 97–98, 152; *see also* Hr'g Tr. 38–39.

60

LLC Agreement."[224]  As evidence that the 2019 Offering and 2020 Offering were done in bad faith, Tygon Peak points to, among other things, Defendants' refusals to reimburse its Rush Street expenses and to pay the Annual Management Fee.[225] Defendants argue Tygon Peak cannot state a claim for breach of the implied covenant because it has not identified a gap in the relevant agreements where the covenant can operate.  I agree.

"The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[226]  "To state a claim for breach of the implied covenant, the Plaintiffs 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the

---

[224] SAC ¶ 198.

[225] SAC ¶ 197 ("Investco and Investco-Members Rockwave VC and Seven Shores devised the Sham Offerings [the 2019 Offering and 2020 Offering] (after already refusing to reimburse Tygon Peak for expenses incurred in connection with Rush Street, refusing to pay the Annual Management Fee, and attempting to buy Tygon Peak out for a nominal value that would deprive it of its promote) in bad-faith and with the specific intent of circumventing Tygon Peak's promote with respect to its Class A Units and stripping Tygon Peak of the rights that are tied to majority ownership of Class A Units.").

[226] *Kuroda*, 971 A.2d at 888 (internal quotation marks omitted).

plaintiff.'"[227]   Additionally, to survive a motion to dismiss, Plaintiffs "must allege that the [decision] was motivated by an improper purpose."[228]

"[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare,"[229] especially "when the contract easily could have been drafted to expressly provide for it."[230]  "It must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter."[231] The implied covenant "cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal documents."[232]

[227] *Wiggs v. Summit Midstream P'rs, LLC*, 2013 WL 1286180, at *9 (Del. Ch. Mar. 28, 2013) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[228] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020).

[229] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006) (quoting *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005)).

[230] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (quoting *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006)).

[231] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (alterations omitted) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

[232] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (alterations and internal quotation marks omitted) (compiling sources and quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

An essential predicate for the application of the implied covenant is the existence of a "gap" in the relevant agreement.[233] "The implied covenant provides a limited gap-filling tool that allows a court to impose contractual terms to which the parties would have agreed had they anticipated a situation they failed to [address]."[234]

The Amended Complaint does not allege any gap in the Investco LLC Agreement,[235] nor can I discern one. Rather, all the conduct of which Tygon Peak complains is covered by the parties' applicable contracts, including the Investco LLC Agreement, and Tygon Peak has brought corresponding breach of contract claims. To the extent Tygon Peak is asserting that the reimbursement and management fee deficiencies breached the implied covenant, those obligations are wholly contractual. The obligation to "reimburse Tygon Peak for expenses incurred in connection with Rush Street"[236] is fully laid out in the Term Sheet,[237] and the obligation to pay Tygon Peak the Annual Management Fee is fully addressed by the MSA.[238] Tygon Peak has not identified a gap in these contracts susceptible of being

---

[233] *See Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *4 (Del. Ch. Jan. 30, 2015).

[234] *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *10 (Del. Ch. Jan. 18, 2013).

[235] *See* SAC ¶¶ 196–98.

[236] *Id.* ¶ 197.

[237] *See* Term Sheet 5.

[238] *See* MSA § 2(B).

filled by the implied covenant. While Tygon Peak may be dissatisfied with the contours of those obligations as I have explained them, it cannot invoke the implied covenant to "rewrite a contract [it] now believes to have been a bad deal."[239]

The thrust of Tygon Peak's implied covenant claim is the 2019 Offering and the 2020 Offering, which Tygon Peak asserts were devised without notice to Tygon Peak and in an effort to dilute Tygon Peak's interest and undermine its promote. But Tygon Peak also asserts these problems with the offerings are breaches of the Investco LLC Agreement, such that there is no room for the implied covenant. Sections 6.3 and 5.8 explicitly address advance notice, and Section 5.10 explicitly addresses Tygon Peak's approval.[240] Section 5.12 addresses whether those offerings were undertaken in bad faith to circumvent Tygon Peak's distributions; Tygon Peak has pled that all bad faith efforts to devalue its Class A interest are in violation of Section 5.12.[241] Indeed, the allegations supporting Tygon Peak's Section 5.12 claim are repeated nearly verbatim in its implied covenant claim.[242]

---

[239] *See Nemec*, 991 A.2d at 1126.

[240] *See* SAC ¶¶ 189–90; Investco LLC Agr. §§ 5.8, 5.10, 6.3.

[241] SAC ¶¶ 191, 194. Tygon Peak has not argued that its implied covenant claim is in the alternative to its claim for breach of Section 5.12.

[242] *Compare* SAC ¶ 197 ("Investco and Investco-Members Rockwave VC and Seven Shores devised the Sham Offerings (after already refusing to reimburse Tygon Peak for expenses incurred in connection with Rush Street, refusing to pay the Annual Management Fee, and attempting to buy Tygon Peak out for a nominal value that would deprive it of its promote) in bad-faith and with the specific intent of circumventing Tygon Peak's promote with respect to its Class A Units and stripping Tygon Peak of the rights that are tied to majority ownership of Class A Units."), *with* SAC ¶ 191 ("In devising the Sham Offerings

Count V simply reiterates Tygon Peak's contract claims; it presents no gap in the applicable contract language to justify application of the implied covenant, nor "allege[s] a specific implied contractual obligation" that could fill it.[243] The Motion is granted with respect to Count V.

### F. Count VI Fails To State A Claim For Breach Of The Investco LLC Agreement Or For Breach Of The Sharing Agreement.

Count VI alleges that "Voice Comm and Investco breached Section 5.10 of the Investco LLC Agreement and Section 2(c) of the Sharing Agreement by failing to obtain Supermajority Approval before resolving to exercise the Option under the Sharing Agreement."[244] I conclude Tygon Peak has failed to state both claims.

First, as discussed, Section 5.10 prohibits Investco from entering into an exchange agreement to exercise the Option without obtaining Supermajority Approval. Count IV states a viable claim that Investco breached that provision. But Count VI cannot claim Voice Comm breached that provision because Voice Comm

---

(after already refusing to reimburse Tygon Peak for expenses incurred in connection with Rush Street, refusing to pay the Annual Management Fee, and attempting to buy Tygon Peak out for a nominal value that would deprive it of its promote), Investco also breached Section 5.12 of the Investco LLC Agreement by taking an action in bad-faith and with the specific intent of circumventing Tygon Peak's promote with respect to its Class A Units and stripping Tygon Peak of the rights that are tied to sole ownership of Class A Units.").

[243] *Wiggs*, 2013 WL 1286180, at *9.

[244] SAC ¶ 200.

is not a party to the Investco LLC Agreement.[245] "Delaware does not recognize breach of contract claims against non-parties to the contract."[246] Insofar as it alleges Voice Comm breached the Investco LLC Agreement, Count VI fails to state a claim.

Tygon Peak's claim for breach of the Sharing Agreement also fails. Tygon Peak is not a party to the Sharing Agreement; that agreement is between Voice Comm, which holds the Promissory Note, and Mobile's "Class A Members" Investco and KMD Weiss, which gained the Option to share in the Promissory Note.[247] Ordinarily, nonparties do not have standing to enforce a contract absent some special status, such as that of an intended third-party beneficiary.[248] Tygon Peak does not address this issue in its brief, and it is unclear on what basis it asserts

---

[245] The parties to that agreement are Investco's members. *See generally* Investco LLC Agr. Voice Comm, effectively a subsidiary of Mobile, in which Investco owns a substantial interest, is not a party.

[246] *77 Charters, Inc. v. Gould*, 2020 WL 2520272, at *19 (Del. Ch. May 18, 2020) (quoting *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *10 n.95 (Del. Ch. Aug. 29, 2018)).

[247] *See* Sharing Agr. 1.

[248] *See United Health All., LLC v. United Med., LLC*, 2014 WL 6488659, at *3 (Del. Ch. Nov. 20, 2014) ("Well-settled within precepts of contract law is recognition that non-parties to a contract ordinarily have no rights under it. This general principle is subject to an exception recognizing that intended, but not incidental, third-party beneficiaries of a contract have legal rights under that contract, despite being non-parties." (footnotes and internal quotation marks omitted) (quoting *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *7 (Del. Ch. May 16, 2007))); *see also Skye Mineral Inv'rs, LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *17 (Del. Ch. Feb. 24, 2020) ("To have standing to enforce a contract, a plaintiff must be a contract party, assignee or an intended third-party beneficiary" (applying and citing New York law)).

standing to enforce the Sharing Agreement.[249]  Count VI fails to state a claim for breach of the Sharing Agreement.[250]

The Motion is granted with respect to Count VI.

### G. Count VII Fails To State A Claim Under The Delaware Deceptive Trade Practices Act.

Count VII alleges Goldberg, Rock Wave Capital, and Rockwave VC violated Delaware's Deceptive Trade Practices Act (the "DTPA").[251]  The Second Amended Complaint's allegations for this claim are thin.  It points to Goldberg's "disparaging

---

[249] The only discussion of Count VI in Tygon Peak's brief is unrelated to the issue of its standing to enforce the Sharing Agreement.  *See* D.I. 92 at 51 ("Finally, Defendants argue that Count VI of the Complaint fails because VoiceComm is not a party to the LLC Agreement.  However, Count VI of the Complaint alleges a breach of the Sharing Agreement, to which VoiceComm is a party.").  Tygon Peak does briefly discuss its claim that exercising the Option violated the Investco LLC Agreement, *see id.* at 61, but that discussion similarly does not address its standing to enforce the Sharing Agreement.

[250] Even if Tygon Peak could assert a claim for breach of the Sharing Agreement, it has not stated that claim.  Tygon Peak argues the Sharing Agreement itself required its approval as the Class A unitholder.  *See id.* at 18–19.  Tygon Peak's argument conflates its Class A Investco units and approval rights in Investco, with the "Class A Units" in Mobile that must vote to exercise the Option.

Section 2(c) of the Sharing Agreement explains how Mobile's members Investco and KMD Weiss, defined as the "Class A Members," Sharing Agr. 1, can trigger the Option and recover a share of Voice Comm's Promissory Note.  The first step in that process requires "an affirmative vote of a majority of the Class A Units."  *Id.* § 2(c).  While the Sharing Agreement does not define the "Class A Units," it uses the capitalized term five times, each time in conjunction with Mobile's "Class A Members," specifically Investco and KMD Weiss.  *See id.* 1, §§ 2(b), 2(c).  It is clear that the undefined term "Class A Units" refers to Investco and KMD Weiss's Class A units in Mobile.  Tygon Peak does not allege it owns any Mobile "Class A Units."

[251] *See* SAC ¶¶ 201–03.

statements about Tygon Peak to Graycliff Partners and Investors Bank" regarding

Tygon Peak's "dereliction of duties and responsibilities."[252] It then concludes:

> In disparaging Tygon Peak's services by making false or misleading representations, to Graycliff Partners and Investors Bank, regarding the services Tygon Peak has provided in connection with [the Acquisition], Goldberg, Rock Wave Capital, and Rockwave VC have violated Delaware's Deceptive Trade Practices Act, 6 *Del. C.* § 2531 *et seq.*[253]

Tygon Peak does not identify a specific statutory provision in the DTPA that

Goldberg, Rock Wave Capital, and Rockwave VC breached.[254] Defendants move to

dismiss Count VII because the Second Amended Complaint is "devoid of any factual

allegations stating a reasonably conceivable violation of the" DTPA and fails to

allege the requisite pattern of deceptive conduct.[255] I agree.

The DTPA prohibits unreasonable interference with the promotion and

conduct of another person's business through the "disparage[ment] [of] the goods,

services, or business of another by false or misleading representations of fact"

committed "in the course of a business, vocation, or occupation."[256] It "encompasses

---

[252] *Id.* ¶ 165; *see id.* ¶ 202.

[253] *Id.* ¶ 203 (first italics added).

[254] *See generally id.*; D.I. 92.

[255] D.I. 88 at 53–54.

[256] 6 *Del. C.* § 2532(a)(8); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 67 (Del. 1993).

two broad areas: (i) false or misleading use of trademarks or other trade identification and (ii) deceptive advertising."[257]  Section 2532 defines deceptive trade practices:

> A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:
>
> (1)  Passes off goods or services as those of another;
> (2)  Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3)  Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
> (4)  Uses deceptive representations or designations of geographic origin in connection with goods or services;
> (5)  Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
> (6)  Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;
> (7)  Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
> (8)  Disparages the goods, services, or business of another by false or misleading representation of fact;
> (9)  Advertises goods or services with intent not to sell them as advertised;
> (10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;
> (11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

---

[257] *Delaware Solid Waste Auth. v. E. Shore Envtl., Inc.*, 2002 WL 537691, at *4 (Del. Ch. Mar. 28, 2002).

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.[258]

"The DTPA was designed to prevent patterns of deceptive conduct, not isolated incidents."[259] Thus, "relief under the statute is dependent on the plaintiff's entitlement to injunctive relief."[260] "A claim for injunctive relief must be supported by the allegation of facts that create a reasonable apprehension of a future wrong."[261]

Among the aforementioned categories of deceptive trade practices, the best fit for Tygon Peak's theory is Section 2532(a)(8), addressing conduct that "[d]isparages the goods, services, or business of another by false or misleading representation of fact."[262] Even assuming Tygon Peak's allegations fit into this category, its DTPA claim would fail because it does not allege a pattern of conduct or any reasonable apprehension of a future wrong. Rather, Tygon Peak's complaint references an isolated incident years ago, namely a 2019 email exchange among Goldberg,

---

[258] 6 *Del. C.* §§ 2532(a)(1)–(12).

[259] *See EDIX Media Gp., Inc. v. Mahani*, 2006 WL 3742595, at *12 (Del. Ch. Dec. 12, 2006) (internal quotation marks omitted) (quoting *Grand Ventures, Inc. v. Whaley*, 622 A.2d 655, 661 (Del. Super. 1992), *aff'd*, 632 A.2d 63).

[260] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *10 (Del. Ch. Jan. 20, 2009); *see State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 537 (Del. Ch. 2005) ("[T]he failure of a party to be able to state a claim for injunctive relief at the time the suit is brought is fatal to claims under the Deceptive Trade Practices Act.").

[261] *Agilent*, 2009 WL 119865, at *10 (internal quotation marks omitted) (quoting *Pettinaro*, 870 A.2d at 536).

[262] 6 *Del. C.* § 2532(a)(8).

Narulla, and representatives from Graycliff Partners and Investors Bank. There is no basis to infer Goldberg's "statements" continued in a pattern thereafter.[263]

Tygon Peak points to *Agilent Technologies, Inc. v. Kirkland*,[264] in which allegations of "two incidents involving purported factual misrepresentation" were enough to sustain a DTPA claim.[265] But the allegations in *Agilent* offered more to support the reasonable apprehension of future harm. In addition to the two discrete incidents, the claim alleged other facts about the defendant's "sales strategy" supporting an inference that the defendant's "trash talking . . . may have been frequent."[266] And the wrongful conduct was ongoing: the *Agilent* Court relied heavily on this fact in concluding the claimant had a reasonable apprehension of future harm and thus, its claim could be remedied by injunctive relief.[267]

Not so here. The email messages Tygon Peak alleges Goldberg sent were in a single exchange over two years ago.[268] Despite amending its complaint twice since October 2019, Tygon Peak alleges no facts to suggest Goldberg's comments are ongoing. Tygon Peak has no basis to secure injunctive relief against Goldberg, Rock

---

[263] *See* SAC ¶¶ 161–65.

[264] 2009 WL 119865.

[265] *Id.* at *10.

[266] *Id.*

[267] *See id.*

[268] *See* SAC ¶¶ 161–65.

Wave Capital, or Rockwave VC for these statements.  The Motion is granted with respect to Count VII.

### IV.  CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** in part and **DENIED** in part.  Counts VIII and IX are dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).  Counts I, II, V, VI, and VII are dismissed for failure to state a claim under Rule 12(b)(6).  Count III survives; Count IV survives in part, as described above.  The parties shall submit an order implementing this decision within twenty days.